## CHRISTIE v. SAWYER.

An attorney may render services and advance money in carrying on a law-suit for a man without property, relying upon an agreement that he shall be first paid from the funds recovered; and this is not either maintenance or champerty.

If a third person fraudulently and collusively take an assignment of such claim, knowing the agreement of the party with his attorney, and such agreement is kept secret from the attorney while the law-suit is in progress, and the assignee compromise the claim and receive the money, he will be held liable for the attorney's bill.

If an attorney, who is a director of a railroad, is openly employed to prosecute a suit against the railroad company, and he endeavors, as such attorney, to effect a compromise of the claim, this will be no objection to the recovery of his bill.

The representative of a party, who has employed an attorney to prosecute a claim, upon an agreement that the costs shall be paid from the proceeds of the suit, and who subsequently makes an absolute assignment without warranty, need not be made a party to a bill in equity, brought by the attorney against the assignee to recover his bill.

IN EQUITY. The case stated by the bill is briefly as follows:

Samuel Currier had a claim against the Boston and Maine Railroad, of over $5,000, for grading part of their road, which was disputed. He applied to the plaintiffs, Messrs. Christie and Kingman, attorneys and counsellors at law, and partners, to prosecute a suit for him for its recovery. He said, and the plaintiffs knew, he was insolvent, and could pay them nothing unless he recovered; and he agreed that they should be first paid, out of whatever money should be recovered or obtained. Relying on this assurance the plaintiffs commenced a suit, rendered their services, and made advances in carrying it on, till their claim amounted to about $1,800. Shortly after the suit was commenced, Samuel Currier assigned this claim to his nephew, John Currier, the defendant's intestate. The plaintiffs allege that J. Currier then knew the insolvent condition of S. Currier, and his inability to pay the plaintiffs for their advances and services, except from the money that might be recovered. They believe that he knew they relied upon being thus paid, and that they were to be first paid out of any money recovered. They allege that this assignment was made without their knowledge or consent, in violation of S. Currier's agreement with them, and collusively and fraudulently on the part of said S. and J. Currier, and that they wrongfully, collusively and fraudulently kept secret and concealed from the plaintiffs the fact of the execution of said assignment. Said S. Currier, with the knowledge and consent, and as the plaintiffs believe, by the procurement of said J. Currier, continued to take the care, management and charge of said action, as the plaintiff and sole party interested; and neither the said S. nor J. Currier, during the life of said John, in any way ever informed or intimated to the plaintiffs that said J. had any right or interest in the claim, or suit; nor did said Samuel nor said Sawyer inform or communicate to the plaintiffs the existence of said assignment, or that said J. had any interest therein, till the fall of 1860, when it was mentioned to said Christie by said Sawyer, as administrator of said John.

Said John Currier lived near the plaintiffs, and often spoke of

the suit as Samuel's.   He was a man of large property, and able to pay counsel, and the plaintiffs would not have prosecuted the suit if they had been informed of the assignment, or of J.'s interest, unless he had become responsible for their fees and charges.   This, they doubt not, was understood by S. and J., and they collusively and fraudulently concealed the assignment, and said J.'s interest, that he might have the advantage of the suit, and avoid liability to the plaintiffs for their services and advances.

Said Christie, during these proceedings, was one of the directors of the Boston and Maine Railroad, and made strenuous but unsuccessful efforts to compromise the claim with the agents of the railroad.

The defendant was fully informed of the plaintiffs' claims, but compromised the suit, in the absence and without the consent of the plaintiffs, for $2,000, and received the money and discharged the action.

The plaintiffs have requested a settlement and payment of their claim of the defendant, without success.

The bill prays an answer under oath, payment of the plaintiffs' claim, and general relief.

The defendant demurred to the bill, because the plaintiffs have not, by their bill, made such a case as entitles them, in a court of equity, to any relief; because their claim is infected with champerty and maintenance; because the services of Christie, in promoting the compromise of said claim, as counsel for the claimant, and as director of the railroad, can not be made the foundation of a claim in equity; and because said S. Currier, being dead, his executor or administrator is not made a party to the bill.

*Sawyer*, and *Wiggins*, for the defendant.

1. A court of equity will not, any more than a court of law, enforce a contract tainted with champerty and maintenance.   In this State there is no statute on the subject, and the common law prevails here.   *State* v. *Rollins*, 8 N. H. 550.   English writers differ in the definition of champerty.   By some it is said to be a species of maintenance, being a bargain by which the champertor agrees to carry on the suit at his own expense, and divide the matter or thing in suit.   4 Bla. Com. 135.   Others, in their definition, omit that part which makes the champertor carry on the suit at his own expense. 1 Hawk. P. C., ch. 84, sec. 1;  Co. Litt. 368, b.   In *Stanly* v. *Jones,* 7 Bing. 369, *Tindall,* C. J., says the offense of champerty is the unlawful maintenance of a suit, in consideration of some bargain to have a part of the thing in dispute, or some profit out of it.   In *Sedgwick* v. *Stanton*, 5 Kern. 294, *Selden*, J., adopts the definition of Hawkins, and adds, "the gist of the offense consists in the mode of compensation, irrespective of the manner in which the suit is to be maintained, because all maintenance of a suit by a stranger was at common law unlawful."   *Russell* says, "whoever assists another with money to carry on his cause, as by retaining one to be counsel for him, or otherwise bearing him out, in whole or in part of the expense of the suit, may properly be said to be guilty of an act of

maintenance." 1 Russ. on Crimes 177. *Hawkins* says, "all maintenance is strictly prohibited by the common law, as having a manifest tendency to oppression, by encouraging and assisting persons to persist in suits which they otherwise would not venture." *Blackstone* (4 Com. 134) says, "maintenance is an officious intermeddling in a suit that does not belong to one, by maintaining or assisting either party with money, or otherwise, to prosecute or defend it." "Maintenance and champerty are deemed illegal, not from the consideration that all the expenses of the litigation are borne by a stranger, but in reference to the evils resulting from officious intermeddling and upholding another's litigation, by personal services as well as money." *Lathrop* v. *Amherst Bank*, 9 Met. 489; *Thurston* v. *Percival*, 1 Pick. 415. This law applies to attorneys and counsellors, as well as others. "A counsellor, having received his fee, may lawfully set forth his client's cause to the best advantage, but he can no more justify giving him money to maintain his suit, than any other person. An attorney can not lawfully carry on a cause for another at his own expense, with a promise never to expect payment; and it is said to be questionable whether solicitors, who are no attorneys, can in any case lawfully lay out their own money in another's cause." 1 Russ. C. 177; *vide Simpson* v. *Lamb*, 4 E. L. & E. 59; *Davis* v. *Sherman*, 15 B. Mon. 64. Nor is it any less champerty and maintenance because the cause is just. *State* v. *Chitty*, 1 Bail. (S. C.) 379; Note to *Russell*, cited above. From the cases it seems to be the law that the encouraging others in law-suits, by advancing the expense, and taking compensation from the proceeds, and waiting for that compensation until the suit is determined, and then to be paid out of the fruits of it, is unlawful.

2. We contend that Mr. Christie, being a director of the railroad, and bound as such to the exercise of good faith,—the extremest good faith to that company,—and being from his position an agent of that company, and, with his co-directors, intrusted by the stockholders with the property and interest of the company, it was not right for him to stand in the place of an attorney at the same time against them, and it was not right for him to commence and prosecute this suit at law against them, and especially when the whole object seemed to be to compel a compromise. Such course was in bad faith to the company, in conflict with his duty as one of the directors, and will not be sanctioned in any court of equity.

3. Samuel Currier's estate has a direct interest in the settlement of this matter. The agreement and employment upon which the plaintiffs rely, were with him, the business his, and though he may have assigned his interest, yet the plaintiffs have no interest in the fund beyond their lawful and proper charges against him, and upon these his estate should be heard. Again, it appears by the bill that Samuel Currier stated that the assignment to John Currier was only by way of security, and the amount of his debt only five or six hundred dollars; and upon that representation Samuel Currier's estate has a direct and important interest in the controversy, and ought to be made a party.

4. From the beginning the only relation between the plaintiffs and Samuel Currier was the ordinary one of attorneys and client; they had no interest or claim to the thing in suit, and, upon their own statement, could have had no lien upon the cause, nor any claim to the fund. Admitting all the facts to be as they state them, S. Currier had a right to adjust and compromise his action, as he might think for his interest; and the attorney has no right to interfere, nor power to prevent such compromise. *Young* v. *Dearborn*, 27 N. H. 327. No court of equity will restrain a party from settling his action as he chooses.

The court of chancery has no general jurisdiction to compel suitors to pay costs due to their solicitors or counsel. The proper and only remedy is by action at law. *Lombard* v. *Robinson*, 2 Paige 276; *In re Southwick*, 1 Johns. Ch. 22. *Sweet* v. *Bartlett* is very similar to this case, and fully sustains our ground, that the bill can not be maintained against John Currier's estate. See, also, *Loyd* v. *Mansell*, 16 E. L. & E. 211.

*Perley* (with him *Wheeler*), for the plaintiffs.

1. There was no champerty or maintenance in any agreement or transaction stated in the bill; no agreement to share the proceeds of the suit; no claim or agreement to pay any thing beyond the ordinary and legal compensation for the services and advances of the plaintiffs in the suit; nor any condition that limited or qualified the plaintiffs' right to recover. In the absence of express agreement, the law implies that the attorney shall have a lien on the amount recovered in a successful suit, for the payment of his fees. This equitable claim courts enforce summarily, in all cases where the action and the process remain in a situation which allows it; and any attempt to defeat this equitable right of the attorney, by a collusive settlement between the parties to a suit, is regarded as a fraud on the attorney. Here was gross fraud and collusion, to defeat the equitable claim of the plaintiffs to be reimbursed for their expenses in the cause, out of the proceeds of the suit. *Young* v. *Dearborn*, 27 N. H. 324. The understanding and agreement between the plaintiffs and Samuel Currier amounted to no more than this: that the plaintiffs were to be paid their legal fees out of the proceeds of the suit; and this is exactly what the law implies, without any express agreement. Their claim to pay did not grow out of any special agreement; was not qualified by any special agreement. They had no right in the suit, nor any control over it, except as attorneys of record. They were to have security for their fees on what was realized as the proceeds of the suit, and their claim to this security, instead of being tainted with crime, is one favored in law and equity, and protected wherever it can be by the summary interference of the court. The English statutes of champerty and maintenance, and the rigid common law doctrines on that subject, are not suited to the genius of our government, or to our social condition, and have never been adopted in this State. *Hadduck* v. *Wilmarth*, 5 N. H. 188; *Stevens* v. *Whitman*, 6 Binn. 420, 421; *Small* v. *Mott*, 22 Wend. 403; *Cassinger* v. *Welch*, 15 Ohio 156; *McGoon* v.

*Aukeny,* 11 Ill. 558; *Caldwell* v. *Shepherd,* 6 B. Mon. 392; *Evans* v. *Bell,* 4 Dana 373; *Thurston* v. *Perceval,* 1 Pick. 417. Maintenance, which includes champerty, is defined to be "an unlawful taking in hand, or upholding of quarrels and sides to the disturbance or hindrance of common rights." 1 Russ. on Cr. 175. It is believed that a prosecution for maintenance could not be supported in this State without actual proof of a corrupt design to disturb or hinder common right in the management of a cause.

2. No part of the plaintiffs' demand is for promoting a compromise of the suit. It is all "for advances and services in commencing and prosecuting said suit." There is no statement of the bill from which it can be inferred or surmised that Mr. Christie acted in any double capacity; or that he made or attempted to make any dishonest use of the fact that he happened at that time to hold the office of director in the railroad, to procure a settlement disadvantageous to the road. He acted, and was well known by all parties to act, as attorney and agent of Samuel Currier, and in no other capacity. He took no part with the other officers of the road in proposing, rejecting, or accepting terms of settlement, and he had nothing to do on either side with the settlement finally made.

3. The representative of Samuel Currier is not a necessary or proper party. The assignment to John Currier was absolute and unconditional, leaving no equitable interest in Samuel; and even while the suit was pending, though the technical legal interest might remain in Samuel, it would not be necessary to make him a party to a bill in equity. Story's Eq. Pl., sec. 153. But here the suit is ended, and the legal as well as equitable right to the money vests in John's representative. Nor, if the defendant is decreed to pay our demand, can he have any claim on the estate of Samuel, for all except a very trifling part of our demand accrued after the assignment to John, and of course was for John to pay; and as to the small sum then due, John must in law be understood to take the suit and claim *cum onere,* subject to the expenses then incurred in prosecuting it. Beside, John could never claim anything through the corrupt and fraudulent transaction which had been contrived to cheat Samuel's creditors.

If the demurrer is well taken, so far as part of our demand is concerned, but does not apply to the rest, it must be overruled for the whole.

BELL, C. J. The suggestion that the plaintiffs' claim is tainted with champerty and maintenance, seems wholly without foundation. Here was to be no division of the spoil, nor stipulation for any share, as such, of the fund recovered. The plaintiffs were to be paid for their services and expenditures, and nothing more. An agreement to pay an attorney or counsellor for his services or advances is not illegal. On the contrary, the claim of an attorney for such services and advances is, as is suggested by the plaintiffs' counsel, one favored by the law, and protected, as far as practicable, by a lien implied by the law itself in his favor. The right to be paid first from the amount recovered upon the claim, by the agree-

ment and understanding of the parties, is of the same character as that protected by this lien, and differs from the ordinary implied right only in its being perhaps more extensive. It is certainly equally meritorious. We are not prepared to say that the law relative to maintenance and champerty is not part of our law. The evils against which these laws were designed to guard are as likely to spring up here as elsewhere, if those safeguards were removed. But we think the law might be administered in a very different spirit here at this day, from what it is supposed to have been in a different state of society. So long as the law gives countenance and encouragement to the employment of attorneys and counsel, to aid suitors in the prosecution and defense of their supposed rights, it can not be deemed maintenance for professional men to render their services to those who need them, for the usual and customary compensation. Nor is it material whether the party is in good credit, and able to pay for those services, as the case proceeds, or the counsel has to rely for his compensation upon the success of a cause he believes well founded. It is usual, and in many cases unavoidable, that the expenses incident to a controversy are paid by the attorney in the cause. Such advances are constantly recovered in actions for costs, and there can be no pretense that the payment of such proper and legal expenses, in good faith, constitutes maintenance, whether they are expected to be paid at once, or from the proceeds of the cause. The true notion on this subject is, we think, laid down by *Richardson,* C. J., in *Shapley* v. *Bellows,* 4 N. H. 355, where he says there is a general understanding between attorneys and their clients that the former shall retain their fees and disbursements out of the sum that may be recovered of the opposite party; and it is not uncommon that attorneys commence actions for poor people, and make advances of money necessary to the prosecution of the suit, upon the credit of the cause. Thus a man in indigent circumstances is enabled to obtain justice in cases where, without such aid, he would be unable to enforce a just claim. And we have no hesitation in adopting the language of Lord *Kenyon* on this subject, and saying "that the convenience, good sense and justice of the thing require that attorneys should have a lien upon the judgments they obtain for their clients;" and see *Thurston* v. *Perceval,* 1 Pick. 417.

Maintenance is defined by *Hawkins* (1 P. C. ch. 83), "an unlawful taking in hand, or upholding of quarrels or sides, to the disturbance or hindrance of common right;" and the same definition is given 1 Russ. Cr. 175; Co. Litt. 368, a; 2 Ch. Cr. Law 234, n. Elsewhere it is said, "it is a malicious or officious intermeddling with a suit that does not belong to him, by maintaining or assisting either party with money, or otherwise, to prosecute or defend it." 4 Bla. Com. 134; 2 Bish. C. L. 105. It is evident that wrongful intention is an essential ingredient in this offense, since a father may rightfully assist his son in his law-suit by his counsel and his money, and *vice versa;* and the books mention other cases in which such assistance is not maintenance. And *Hawkins* says, (B. I., ch. 83, sec. 28) "there is no doubt but that an attorney may lawfully prosecute or

defend an action in the court, wherein he is an allowed attorney, in behalf of any one by whom he shall be specially retained, and that he may assist his client by laying out his own money for him, to be repaid again." The bill shows that in this case there was a distinct agreement that the advances should be repaid, and that they should be first paid from whatever might be recovered in the suit. There is no pretense of champerty in this case, which consists in "a bargain with a plaintiff, or defendant, to divide the land or other matter in dispute between them, if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense." 4 Bla. Com. 135. Here was no agreement for any division of the spoil; no stipulation for any share of the fund recovered. The plaintiffs were to be paid for their services, and repaid their expenditures, and nothing more. And this falls entirely short of the idea of champerty. The plaintiffs, in setting forth their agreement in their bill, have stated a transaction free of malice, or officiousness, or of any intent to disturb or hinder common right; and their statement, being admitted as it is made by the demurrer, we are not at liberty to assume the existence of motives or purposes which would render the transaction illegal.

2. It is objected that the compromise set up in the bill can not be made the foundation of any claim in equity, because the plaintiff, Christie, was both an agent for the original plaintiff, and for the railroad, of which he was a director; relations in which no man can be permitted to act at the same time. But this objection does not rest on any thing stated in the bill. No compromise is there stated to be made by Mr. Christie. Various efforts made by him, as attorney for S. Currier, to effect a compromise, are stated, all unsuccessful, and leading to no result; but the express allegation of the bill is, that the defendant, after full notice of Mr. Christie's claims, in his absence, and without his knowledge or consent, went to Boston, and himself made the compromise with the committee of the directors of the road, and received the money paid. His efforts to promote a compromise, made as the attorney of an adverse party, can not prejudice his claim. They might be made in the utmost good faith, as to both parties concerned — the railroad having not the slightest ground of complaint. Probably no person knew better what was for the interest of both.

3. It is objected by the demurrer, that the representatives of Samuel Currier are not a party to the bill ; but there seems no foundation for this objection, because no relief is sought against them, and because, so far as appears, they have no rights which can be injuriously affected in any way by any decree which can be made in the case, either directly or consequentially.

The question raised by the bill is, if the administrator of John Currier's estate shall pay the plaintiffs' claim for their services and advances. In that question the representatives of Samuel Currier have no direct interest. If they had an interest in resisting the plaintiffs' claim, they should be made parties. Such interest might exist if the assignment to John Currier was in trust, or by way of mortgage, but nothing appears having any tendency to show that

but the talk of Samuel Currier, that the assignment was nothing, and was only made to secure him for hay he had of him. But there is no averment in the bill from which it can be legally inferred that the assignment was not absolute and unconditional. If any such state of facts is relied on, it must be shown by plea or answer, as it does not appear on the face of the bill. Such an interest would exist if the estate of Samuel Currier was liable to make good to the estate of John Currier whatever the latter may be required to pay the plaintiffs; but there is nothing in the bill from which any such liability can be inferred. As the case is stated, the parties deceased were not co-partners nor co-contractors. Samuel was not a surety for John, nor a guarantor of the claim, so as to be liable for costs. The actual contract was with Samuel, the debt is properly charged to him, no other person being known as a contracting party. In whatever capacity the estate of John may be charged, it is not seen that Samuel's estate has any change made in its rights or liabilities, except that it may be relieved of this debt. If so relieved it will not be by reason of any apparent right to such relief, but merely that the debt, being once paid by one liable to pay it, is not to be paid again.

4. The great point of the demurrer is, "that the plaintiffs have not by their bill made such a case as entitles them in a court of equity to any relief against the defendant." Now we suppose that if two persons deliberately, collusively, fraudulently and secretly, make and take a transfer of a claim in course of litigation, knowing that the counsel concerned relies on the agreement of the plaintiff to be paid out of the proceeds of the suit, with the intention to conceal the same, while the suit is going on, and the assignee may thus reap the benefit of the suit without paying the expenses, there can be no doubt this is a gross fraud, and such an assignment will be set aside as fraudulent. This is the case as it is here alleged and admitted, and it seems clear that the assignment should be regarded as a nullity, so far as it interferes with the plaintiffs' claim; and the defendant having got into his hands money which equitably belongs to the plaintiffs, should be decreed to pay it over to them.

Independently of the question of fraud, the claim of the plaintiffs seems sustainable even at common law. It is well settled that if one man labors for another, or renders him service in his business, and that other, knowing all the facts, stands by and sees what is done, and makes no objection, he is estopped to deny that the labor or service was rendered at his request. 1 Greenl. Ev., sec. 197; 2 Greenl. Ev. 108, and cases cited.

In this case, according to the bill, from a few days after the suit in question here was commenced, this claim became the absolute property of John Currier; its prosecution was exclusively his affair and business; his uncle, Samuel Currier, had no longer any interest in it; John Currier stood by and saw Samuel Currier directing the prosecution, as if he was still the sole party in interest; saw these plaintiffs expending their time and money in its prosecution, and made no objection whatever. Neither he nor his representative can

.be heard, either in equity or at law, to deny that the services and expenses were done and incurred by his authority, and for his benefit. Though Samuel Currier continued to be the apparent manager of the suit, yet, as he had no interest of his own, he must be regarded as an agent of John Currier, who, seeing him thus active in his business, must be taken to have authorized and requested him thus to act, and can not deny his agency.

This legal claim can not be alleged as any ground for resisting this suit in equity, since the fraud imputed lies at the very foundation of the claim, and is a clear ground of equitable jurisdiction.

*Demurrer overruled.*