# IN RE DISBARMENT OF F. P. SIZER AND H. A. GARDNER.

### In Banc, December 30, 1924.

1. **JURISDICTION: Disbarment.** The Supreme Court has jurisdiction of a petition filed by members of its bar asking that certain other members be disbarred from practicing law in this State. [Following State ex rel. Selleck v. Reynolds, 252 Mo. 369.]

   *Held*, by DAVID E. BLAIR, J., dissenting, with whom JAMES T. BLAIR, J., concurs, that this court has no jurisdiction, and therefore the petition should be dismissed.

2. **DISBARMENT: Grounds Other than Statutory: Caution.** Where statutes fix the grounds or charges upon which attorneys may be silenced from practice, it is a debatable question whether they can be disbarred on grounds or charges other than those stated in the statutes. But in any event the power to disbar is one which should be exercised with great caution, and an order of disbarment should be made only where the delinquent has shown himself utterly unfit to be a member of an honorable profession and an officer of the court.

3. ————: **Loan to Client.** A lawyer can loan money to a client without violating either ethics or law, if the loan is not a consideration for his employment.

4. ————: **Proposition Unknown to Lawyer.** A proposition to a client that a lawyer would pay him $5,000, if he would permit the lawyer to bring suit to set aside a settlement made with him by a claim-agent of a railroad, made by others who assumed to act for the lawyer and made without his consent or knowledge, and made while the intervening petition of the lawyer to enforce his lien for one-third the amount of the settlement was pending, is not ground for the disbarment of the attorney.

In re Sizer and Gardner.

5. ———: **Agreement to Support Client.** A charge that the attorney agreed to give a client money to live upon during the pendency of a suit for damages against a railroad, upon condition that the client would employ the attorney to prosecute the suit, if shown by all the testimony never to have been made, but to be a false charge made by a thoroughly impeached and discredited client, is no ground for disbarment.

6. ———: **Agreement to Pay Cost.** The charge that the respondent lawyers through an agent solicited a certain man, who had been injured by a railroad, to employ them to bring for him a suit for damages, and represented that they would pay all costs and advance him money as he needed it, fails for want of proof in this case.

7. ———: **Ex parte Affidavit.** An *ex parte* affidavit, made by a party who had formerly been a client of the respondent lawyers, is not competent evidence in a proceeding to disbar them.

8. ———: **Hearsay.** Testimony of a witness, who had a claim for damages pending against a railroad, that another man, who had a like claim and had employed the respondent lawyers to prosecute his suit, had told him that respondents had paid him seventy-five dollars per month while his case was pending, is pure hearsay. Besides, in this case, such other person denied that he had ever made such a statement, and both he and respondents testified that he was not paid any sum pending a determination of his case.

9. ———: **Employment of Investigators upon Salary.** Adhering to the statutory prohibition inhibiting a lawyer from dividing fees with one not licensed to practice, it is, *held*, that lawyers, engaged in prosecuting suits against railroad companies and other corporations to recover damages for personal injuries have as much right to employ investigators not licensed to practice, at a designated salary per month or year, as such railroad and other corporations have to employ unlicensed persons as claim-agents to look up evidence and make adjustment of claims.

10. ———: **Subornation of Perjury.** A charge that respondent lawyers, in the trial of an action brought by them for a client against a railroad company, were guilty of subornation of perjury, in that they asked said client questions which elicited answers to the effect that he had never been arrested and had not pleaded guilty to a certain criminal charge of stealing shoes from a railroad car, whereas they knew said client had been arrested, had pleaded guilty and had been fined and had paid said fine, is not sustained, where the facts were that said client was not arrested, the information was not served upon him, the plea of guilty was made by the attorney for the railroad without consulting him, and the

fine was paid by his brother without his knowledge; for under such circumstances the client was not guilty of perjury, and consequently the lawyers are not guilty of subornation of perjury.

11. ———: *Amendment of Petition.* An application to amend a petition, containing many charges, in a proceeding to disbar attorneys, should be refused where (a) the matter sought to be incorporated is not only stale, but the allegations of its substance are indefinite and uncertain, and (b) the complainants had previously announced that they were through taking evidence in chief unless their pending request for an order authorizing an inspection of respondents' private books and papers were granted, and that request was denied.

Citations to Headnotes: 1 to 7, **Attorney and Client,** 6 C. J. pars. 38, 37, 58 (1926 Anno), 77, 76; 8, **Evidence,** 22 C. J. par. 167; 9 to 11, **Attorney and Client,** 6 C. J. pars. 58 (1926 Anno), 42, 69.

*Petition to Disbar Attorneys.*

PETITION DISMISSED.

*Geo. H. English, A. T. Dumm, C. F. Wescoat, N. T. Cave* and *Jno. P. McCammon* for petitioners.

(1) Proceedings to disbar an attorney are not criminal proceedings, but civil. Philbrook v. Newman, 85 Fed. 139; State v. Clark, 46 Iowa, 159; Slemmer v. Wright, 46 Iowa, 705; Mattler v. Schaffner, 53 Ind. 245. (2) The omission of verification of the original petition is of no consequence and the motion should be overruled. (a) The provision of the statute requiring petition to be verified is not jurisdictional. If the accused has been notified and has opportunity to defend, jurisdiction is acquired. Jackson v. State, 21 Tex. 668; Randall v. Brigham, 7 Wall. 523; Ex parte Wall, 17 Otto, 265; United States v. Parks, 93 Fed. 414; In re Bowman, 7 Mo. App. 567; State ex rel. v. Laughlin, 10 Mo. App. 1. (b) By appearance and answer respondent waived objections to jurisdiction. Huntington v. House, 22 Mo. 365; 31 Cyc. 732. (3) An

attorney may be disbarred in one jurisdiction or in one state for acts or misconduct committed in another state. In re Mark, 101 N. Y. Supp. 680; In re Lamb, 94 N. Y. Supp. 331. (4) The correspondence between respondent Gardner and Robertson should be considered by the court as legitimate matter of cross-examination. Butler v. Watkins, 13 Wall. (U. S.) 456; 40 Cyc. 2480, 2486. (5) Solicitation of employment is a violation of a lawyer's professional obligation and cause for disbarment. Ingersol v. Gold Creek Coal Co., 117 Tenn. 263; In re Clark, 184 N. Y. 222; In re Gorsuch, 113 Kan. 380; In re Judy, 114 Kan. 57; In re Staton, 112 Kan. 226; Chunes v. Railway, 298 Fed. 964; Weinard v. Railway, 298 Fed. 977.

*Sizer & Gardner*, pro se, *A. L. McCawley*, *Wm. J. Kiely* and *John T. Sturgis* for respondents.

(1) The motion to dismiss filed herein for failure of petitioner to print and file abstracts of the record for use of this court, should be sustained. This is as essential in original proceedings in this court as in ordinary appeals. State ex rel. Pedigo v. Robertson, 181 S. W. 987; State ex rel. Kansas City v. Ellison, 219 S. W. 90; State ex rel. Hurt v. Wurdeman, 250 S. W. 46. (2) The motion to dismiss for failure to verify the petition and charges made herein should be sustained. Under Sec. 682, R. S. 1919, regulating disbarment in this State "charges against an offending attorney shall be in writing and verified." This provision is in connection with provisions as to who may prefer the charges and in what courts. If it be granted that this court has inherent power to disbar attorneys, yet the Legislature has the power and right within reasonable bounds to limit and regulate the exercise of such power and define the procedure, and the statutory provision that the charges "shall be in writing and verified" is mandatory and a reasonable and valid regulation. Jones v. Sanderson, 287 Mo. 369; State ex rel. Selleck

v. Reynolds, 252 Mo. 369; Railroad v. Gildersleeve, 219 Mo. 200; Ex parte Creasy, 243 Mo. 708; State ex rel. v. Gibhart, 87 Mo. App. 546; Ex parte Burr, 9 Wheat. 527. This is a proceeding under the statute to disbar. Where verification is made mandatory by a statute it is essential to the rendition of a valid judgment. Robertson v. Robertson, 207 Mo. 137; Hinkle v. Lovelace, 204 Mo. 227; Norman v. Ins. Co., 237 Mo. 576. Here the question of verification is raised before the case is submitted for decision. Even if the verification of the petition is not jurisdictional and may be waived, we see no sound reason for saying that it is waived merely because defendants filed their answer or return to the writ and attended the taking of evidence before filing the motion to dismiss. There is no element of estoppel in such failure and the motion is timely. (3) There is no contention by defendants that a proceeding to disbar is a criminal rather than a civil proceeding. Such proceeding, however, is highly penal if not *quasi-criminal*, and the statutes governing same will be strictly construed and the accused will not be convicted except in strict compliance with the statutory regulations and on clear and convincing evidence. Ex parte Burr, 6 L. Ed. 152, 9 Wheat. 528; Ex parte Garland, 4 Wall. 333; Bradley v. Fisher, 20 L. Ed. 646, 13 Wall. 335. The charges must be specific and definite and the evidence will be confined to the exact charges made. State ex rel. v. Gibhart, 87 Mo. App. 542; Weeks on Attorneys, sec. 83. (4) Sec. 668, R. S. 1919, makes it unlawful for an attorney to divide fees with any person not a lawyer, which would include the payment of a commission or percentage for procuring cases. That these defendants had violated this statute is made prominent in the petition and is evidently the charge on which petitioner mainly relied in bringing this proceeding. There is no evidence whatever to sustain this charge. But, to the contrary, the charge is disproved. That charge goes out of the case for want of proof. It is

improper to introduce evidence outside any issue made by the pleadings and after this court had refused to allow an amendment covering a new charge that defendants divide fees with one William C. Robertson, it was clearly improper to introduce evidence supporting such a charge. While much latitude is allowed in the cross-examination of a witness, it is improper to seek to inject incompetent evidence in a case under the guise of cross-examination. It was a transparent subterfuge on the part of petitioner to seek to put in evidence the alleged copies of letters to or from said Robertson. 40 Cyc. p. 2484, note 69, p. 2486, note 78; Summers v. Tarpley, 208 S. W. 269; 1 Wigmore on Evidence, sec. 878. Moreover there is no evidence now before the court that there were such original letters or that the offered documents were correct copies. The evidence has been closed and in this State of the record this court cannot consider this matter. (6) While it is charged by petitioner that defendants paid money as an inducement for contracts and business, yet the only testimony on this question is that defendants made small loans to three different clients, and the testimony is undisputed that these amounts were loans made to clients after the relation of attorney and client existed, and represented money borrowed from the defendants by these three clients. This constituted no infraction of the law and smacks neither of champerty nor maintenance. Taylor v Parks, 171 Mo. App. 254; Mytton v. Mo. Pac., 211 S. W. 111; Shelton v. Franklin, 224 Mo. 342; 11 C. J. 245, sec. 27. (7) These defendants still insist that this court has no jurisdiction to hear this original proceeding. This point was briefed and argued and the jurisdiction upheld by a divided court on a motion to dismiss. As supporting the proposition there announced that this court has been holding contrary to the views there expressed by the chief justice as to want of jurisdiction in this case "for practically a century," the court cites: State ex rel. v. Reynolds, 252 Mo. 369; State ex rel. v. Mullins, 129 Mo. 236; State ex rel. v. Harber, 129 Mo. 271;

State ex rel. Jones v. Laughlin, 73 Mo. 446. Clearly, none of these cases have placed this interpretation on this constitutional provision prior to its readoption by the Constitution of 1875. The majority opinion cites, however, the cases of State v. Foreman, 3 Mo. 602; Strother v. State, 1 Mo. 605; and State v. Watkins, 3 Mo. 480, as placing a construction on this constitutional provision upholding this court's original jurisdiction prior to its adoption as part of the present Constitution. This is certainly a misapprehension. Those three cases were all tried in the circuit court and reached the Supreme Court as appellate cases. There was no occasion for the Supreme Court to there consider its power and jurisdiction to hear and determine an original proceeding brought in such court to disbar an attorney. The rights involved are purely personal, though valuable, and, in such cases, the fact that one or more persons have been deprived of rights by erroneous decisions of this court furnishes no reason for repeating the error. Long v. Long, 79 Mo. 656; 7 R. C. L. 1000; 11 Cyc. 749; Arnold v. Knoxville, 3 L. R. A. (N. S.) 840; Daniel v. State, 54 L. R. A. 289; Ex parte Holman, 21 L. R. A. (N. S.) 242.

GRAVES, C. J.—The record in this case is of tedious length—1719 printed pages. We say tedious, because there is so much useless matter which proves nothing. Both sides have been guilty, and hence the freedom of criticism. With it all, it should be said that the oral combats between counsel have furnished spice, which rendered interesting the reading of the two printed volumes. The only regret is the evidence here and there evinces a little feeling. There should be none in a case entitled as is this one. On the face of the pleadings the case appears to be one in the name of the officers of the Kansas City and Springfield bar associations to disbar F. P. Sizer and H. A. Gardner, doing business as attorneys at law under the firm name of Sizer & Gardner at Monett, Missouri. At least Monett is the headquar-

ters of the firm, but their business (specializing in cases of tort) seems to have extended over much of Missouri, and several other states. Later representatives of the State and St. Louis bar associations were permitted to appear. That the firm succeeded in their line of work is thoroughly evidenced. Both complainants and respondents are members of the bar of this court. Both are entitled to the kindly presumptions arising from the fact that they are licensed to practice here. The individual complainants and the respondents should be treated in a manner not inconsistent with the relationships above stated—for they are all officers of this court. We say individual complainants, because the said bar associations are not parties to the action, but, as said, some of their officers constitute the complainants. It is suggested that under the law the associations could not be complainants, and we think this true. It suffices to say that they are not (as associations) complainants, but this fact is immaterial to a decision upon the merits. The purity of the bar is the prime question. This is the important matter presented by the pleadings, and the important matter for determination here. In the law, as in other learned professions, there are those who specialize in one class or another of legal work. This is proper so long as the members of the classes conduct themselves as real lawyers. There are black sheep in all flocks, and it is proper that all such should be eliminated. In this case it is said that so called damage-suit lawyers were procuring business, and judgments in their cases, at Kansas City, and other places by unprofessional and other wrongful practices. To stop this the first move was made in Kansas City. An organization composed of some eleven railroads (centering in Kansas City), the city itself, through its legal department, one Kansas City newspaper, two or three indemnity insurance companies, a light company and some other corporations, joined hands to suppress the vice. Mr. I. N. Watson, a respectable and reputable lawyer of the city, chanced to represent

the paper and a railroad, both of large proportions. According to his evidence he became the *alter ego* of the lawyers representing these corporations, and meetings were held at his office. His railroad had in its employ one by the name of Pendell, and this party was agreed upon as the proper man to secure evidence, by way of affidavits, against transgressing lawyers, who were suing all these several corporations for damages. All agreed to "chip in" (pardon the expression, but it fits) their proportionate part of the $300 per month for Pendell to seek the evidence (in the form of affidavits) against said transgressing lawyers, suing such corporations. Mr. Pendell was also allowed an expense account, the exact details of which do not clearly appear. These corporation lawyers were not the bar association, but members of some one of them. Pendell, relieved temporarily from duties with his railroad, began his work for these associated corporations, who were putting up $50 each, per month, to a fund for the work.

It is claimed, in the evidence, that good work was done in Kansas City, and some objectionable members of the bar were eliminated. Sizer & Gardner had many suits against some of these railroads, and later the guns of Pendell were turned upon them. The result was that the bar association officers were induced to act, and this law suit is the result. For reasons not satisfactorily explained, this man Pendell could never be induced to appear in Missouri before our commissioner, although he seems to have been thoroughly in touch with Mr. Watson.

Feeling ran high, and it is intimated that prosecutions were threatened for false evidence upon both sides. As a final resort our commissioner, in fairness to both sides, fixed Sedalia, his home town, for Pendell to testify. He failed to appear.

While the charges are nominally filed by officers of the bar associations, they were clearly induced by the representatives of the corporations aforesaid. The bar associations took up this case at such suggestions. It

In re Sizer and Gardner.

does not clearly appear in the record, but it can well be inferred from what does appear, that these corporations are financing this case. That they financed Pendell is openly admitted. That they were contributing to a fund at the rate of $50 each per month is candidly stated. This much more than paid Pendell and his legitimate expenses. How long these payments were to continue does not appear, but we are but humans, and can draw conclusions from admitted facts. The evidence further discloses. that feeling ran high in Kansas City, and an attempt was made to organize another bar association in that city on the pretense that the then present association officers were men largely engaged in protecting corporation clients from damage suits. These lawyers were largely engaged by plaintiffs in damage suits, and they proceeded through their investigators to investigate the defending damage-suit lawyers, and from dissatisfied clients the evidence shows many affidavits were obtained against some of them. No action was ever taken upon them, however, and the proposed new association never materialized. Sizer & Gardner had nothing to do with the Kansas City move. It clearly appears that the move first started in Kansas City, as stated above, and finally Sizer & Garner were made the subjects of investigation before the present action.

Let us speak plainly, as courts should speak, and say that every earmark of the evidence in this case shows that it is an effort by corporation lawyers as against what they call damage-suit lawyers  All this (true, as it may be, and as we think it is) does not change this case. The motive for preferring the charges is of small consequence, if, in fact, the charges are sufficient in law, and the respondents are guilty. So that, we can concede a contest (upon the one side) by the defending corporation damage-suit lawyers and the prosecuting damage-suit lawyers upon the other, and the case yet remains as to the sufficiency of the charges and the sufficiency of the proof. If the bar associations, *sua sponte*, had preferred the charges, we would have one background, but

where the corporation lawyers of the associations have induced the associations to act upon evidence procured by a special expert, such as Pendell, the background is different. We have to take the picture as it is made to appear. Fifty dollars per month from a long list of interested corporations will cover much more than Pendell got for procuring affidavits. Such is a general outline. In our limited experience at the bar we represented (at different periods) both sides of such cases as are involved here, and we hope not to overdraw inferences from the evidence before us.

### THE CHARGES.

The petition is long and full of detail. In the brief the learned counsel for petitioners have undertaken to outline their petition, and that their views of their own petition may appear we quote from their brief as follows:

"This is an original proceeding in this court, having for its object the disbarment of respondents upon the charges set forth in the pleadings. This court has appointed a commissioner before whom testimony has been adduced by both parties and whose report on such testimony has been filed in this court. The petitioners are attorneys and are officers or members of executive committees of various bar associations. The charges are eight in number and the facts relating to each one are in brief as follows:

"*The Parker Case.* The evidence discloses that defendants through an agent named Robinson agreed with one Parker, who had a claim for damages against a railroad company, to represent him for fifty per cent of all sums collected, agreeing to investigate the cause of action at their own expense; agreeing further that Parker's part in settlement of the claim should be equal to at least one thousand dollars and agreeing to pay Parker $100 as living expenses while his case was pending. It was admitted that said one hundred dollars was actually paid by respondents to plaintiff, respondents describing it as a loan.

"*The Ellis Case.*  That the respondent Sizer through an agent, Todd, and another attorney named Johnson, offered one H. C. Ellis the sum of $5000 to be permitted to represent him as an attorney in a proceeding to set aside a settlement of $10,000 already received or agreed upon by Ellis for personal injuries received from a railroad company.

"*The O'Connor Case.*  That respondents through one Harry Davis and R. C. Robinson solicited and procured employment as attorneys in a suit against a railroad company for personal injuries received by certain wards of O'Connor and agreed to pay, and did pay, some of the expenses of such litigation and agreed to advance money to O'Connor to live on while his cases were pending.

"*The Holloway Case.*  That respondents through an agent named Workman solicited one Frank Holloway to employ them as attorneys in an action for personal injuries against a railroad company and represented that they would pay all costs and advance Holloway money if he needed it.

"*The Chaffee Case.*  That the respondent Sizer with one Wilkinson having been employed to represent Chaffee in an action against a railway company for personal injuries, agreed to, and did, advance to said Chaffee certain sums of money to live on while the suit was pending.

"*The Childers Case.*  That respondents solicited and obtained employment as attorneys for Childers in an action against a railway company for damages for personal injuries, and as a part of said contract agreed to advance money to said Childers for living expenses pending the suit, and that respondent Sizer did pay said Childers $75 at the time of the execution of the contract.

"*The Wiley Case.*  That respondents through one Davis, one Moore and one Robinson solicited employment as attorneys for said Wiley in a claim for personal injuries against a railroad company. And as an inducement offered to place $5000 to the credit of Wiley

in a bank as soon as Wiley should sign a contract authorizing them to handle the case.

"*The Amber Case.* That the respondent Sizer, while appearing for one B. L. Amber in the trial of a damage suit against a railroad company, asked said Amber questions calculated to and which did elicit testimony from said Amber to the effect that he had never been arrested or had pleaded guilty to a certain criminal charge. That said Sizer knew that if Amber should so testify he would be committing perjury for the reason that the records of the circuit court showed Amber's plea of guilty and his fine; said Sizer had appeared for said Amber as his attorney in connection with said criminal charge, had personally gone upon a recognizance bond of said Amber when Amber was bound over to the grand jury after a preliminary trial, and that said Sizer had personally by his own check paid the fine assessed against said Amber."

Such is the complainants' outline of the charges. Whether they accord either with pleadings or proof is a matter for our determination. They at least serve as a basis for a consideration of the case. The applicable facts can be considered along with these alleged charges. Suffice it to say that the return of respondents places in issue all of these material allegations of the petition. In one or two instances the railroad lawyers settled the cases over the heads of Sizer & Gardner, notwithstanding their contracts. They do not counterclaim, however. Our commissioner was directed to hear all evidence, subject to objections, if such were made, and as a result we have a volume without substance in much of the record. This, however, more properly belongs to the opinion, rather than to a statement.

Our jurisdiction in the case was challenged, and has been and is now challenged, so that it is a live question. Details will be left to the opinion.

I. No substantial changes in the law of disbarment occurred until after the case of State ex rel. Ellroy v. Selleck v. Reynolds, 252 Mo. 369, in July, 1913. In 1889 we had a system for admitting and disbarring attorneys.

[Chapter II, Vol. I, R. S. 1889.]   Circuit courts, courts of appeals, and the Supreme Court could all admit and disbar.   By the Act of 1905 the power to admit to the practice was limited to the Supreme Court (Laws of 1905, p. 48 et seq.) but in other respects the law remained substantially unchanged.   [R. S. 1899, vol. 2, chap. 73.] The law in substance, so far as admission to the bar, and disbarment therefrom, continued to and through the Revised Statutes 1909, [*Vide* Vol. I, R. S. 1909, chap. 9, p. 400.]   This was the law held in review in Selleck's case, supra.   After Selleck's case, there (Laws 1915, p. 99 et seq.) was passed an individual act of three sections, but without reference to any previous law.   This new law undertook to define the terms "practice of the law" and "law business," and who should engage in the same, with a prohibition against dividing fees with one not licensed to practice.   To split fees with an unlicensed lawyer was made a misdemeanor punishable by fine of not less than $25, nor more than $500.   Other deterrent provisions were in this new act.   It was evidently thought that this Act of 1915, supra, did not cure the troubles suggested in Selleck's case, supra, and in 1919 certain sections of Revised Statutes 1909 were stricken out, and new sections in lieu thereof written and enacted in place thereof.   [Laws 1919, p. 151 et seq.]   These amendments appear in Revised Statutes 1919, as Sections 681, 682, 683, 684, 685, 686, 687, 688 and 689.

Section 681, mentioned supra, specifies the things for which disbarment may be had:   "Any attorney or counselor at law may be removed or suspended from practice in the courts of this State for any of the following reasons:   First, if he be convicted of any criminal offense involving moral turpitude; second, if he unlawfully retain his client's money or if he is guilty of any malpractice, fraud, deceit or misdemeanor whatsoever in his professional capacity; third, if he shall have been removed, suspended or disbarred from the practice of law in any other state or jurisdiction and shall fail to

306 Mo.—24

disclose such fact in his application for license to practice law in this State.''

The Revised Statutes of 1909 specified the grounds in its Section 951, thus: ''Any attorney or counselor at law who shall be guilty of any felony or infamous crime, or improperly retaining his client's money, or of any malpractice, deceit or misdemeanor in his professional capacity, may be removed or suspended from practice, upon charges exhibited and proceedings thereon had, as hereinafter provided.''

In both the Revisions of 1889 and 1899 the provisions were the same (R. S. 1889, vol. 1, chap. 2, sec. 611, p. 236; R. S. 1899, vol. 2, chap. 73, sec. 4924, p. 1163) and read thus: ''Any attorney or counselor at law who shall be guilty of any felony or infamous crime, or improperly retaining his client's money, or of any malpractice, deceit or misdemeanor in his professional capacity, may be removed or suspended from practice, upon charges exhibited and proceedings thereon had, as hereinafter provided.''

The foregoing may be more historical than pertinent from a legal view, but it shows the status of the law, applicable both to pleadings and facts involved here.

In this particular case we have disposed of our jurisdiction, and upon that it is not necessary to write. There are those of our members who think that we are without jurisdiction, and will no doubt so express and record themselves. As for myself, I am satisfied with the conclusions reached in Selleck's case upon that question. To it might be added Jones v. Sanderson, 287 Mo. 176, 180.

II.  Counsel for Sizer & Gardner filed a motion to dismiss for the reason that the petitioners failed to file an abstract of record at all within the time prescribed by our rules; and also because the brief (which was filed in time) failed to contain a full and concise statement of the facts as required by the rules. They now urge the latter question. Counsel were given time to file a printed record, and such has

Abstract and Brief.

been done.  However, in our statement of the case we
have set out the facts stated.  They consist of less than
three printed pages, and these consist of a recitation of
the things pleaded, rather than the things proven.  To
what we have quoted in our statement should be added
(for it immediately follows the quotation) the following:

"Testimony was adduced by petitioners tending to
prove all of the charges and all of the facts as above
stated.  Respondents adduced testimony in contravention
and themselves testified denying said charges.

"One of the charges of the petition was to the effect
that the respondents had agreed to and did divide with
their employees, Robinson and Todd, fees obtained by
them in the settlement of the cases hereinbefore men-
tioned.  *No direct testimony on this point was adduced
by petitioners,* though facts and circumstances were
shown from which the inference might reasonably be
drawn.  *Neither said Robinson nor said Todd* was pro-
duced by either party as a witness."

The foregoing is the statement of facts in a record
containing 1719 printed pages, and is the only state-
ment of facts served within the time prescribed by our
rules.  With the view which we have of the case, we
shall leave undecided this question as to the sufficiency
of the statement made in the brief.

III.  Another contention urged is that the petition
was not verified as required by law.  Section 682,
Revised Statutes 1919, among other things
Verification says:  "Charges against an offending attor-
of Charges. ney shall be in writing *and verified,* and may
be preferred by any member of the bar in good stand-
ing, or by any judge of a court of record required by law
to be a person learned in the law."

The Act of 1909, and previous laws did not require
this verification.  [See R. S. 1909, sec. 951 et seq.]  Even
before the incorporation of the word "verified" in our
statute, Judge GOODE for the St. Louis Court of Appeals,
ruled that verification was required, but that such
affidavit might be waived.  [State ex rel. v. Gebhart, 87

Mo. App. 546.] At this point we shall not discuss the question (1) whether, where the law specifically called for verification, it could be waived, or (2) if it could be waived whether or not there was in fact waiver. We leave the matter, for attention later, if necessary.

IV. Another matter suggested (in a way) by the answer in this case, will be stated and passed. There are eight specific charges made against respondents. Some of them are clearly referable to contracts made in sister states, and to suits filed in such sister states under those contracts. The pleadings do not show, nor does the evidence adduced, show, that the alleged acts and contracts violated any law or laws of such sister states. We mean laws affecting the conduct of attorneys, as well as other laws.

Contracts Made in Foreign State.

To illustrate in this suit, let us suppose a case. Suppose the law of Iowa relating to contracts between attorneys and clients not only permitted conditional fees, but further permitted the lawyers to advance money to his client pending the action for the payment of costs and other matters, and a Missouri lawyer was called into an Iowa case, and made a contract under the Iowa law, could such lawyer be disbarred in Missouri, conceding for the supposed case that our law condemned the practice? And further, if we did undertake to disbar for acts in a sister state, would not the charges perferred have not only to charge the acts in the sister state, but further charge, and the evidence show, that the practices were improper in the state where done? These suggestions lie within the record before us.

V. We have left open several questions, supra, that we might go to the meat of this case. There is a question as to whether or not where state statutes fix the grounds or charges upon which members of the bar may be silenced from practice, can one be disbarred upon grounds or charges other than those stated in the

statute. The question is at least debatable, and in 4 Cyc. 906, it is stated that the general rule is "that such statutes do not restrict the general powers of the court over attorneys, who are its officers, and that they may be removed for other than statutory grounds." The same authority summarizes these other grounds as (1) bad character, (2) conviction of crime, (3) fraud in procuring admission, (4) fraudulent conduct toward the client, (5) improper treatment of the court, (6) perverting or attempting to pervert justice by deceiving or misleading the court, by tampering with witnesses, or by false testimony, (7) misuse of records and papers, (8) certain non-professional misconduct making him an unfit person to manage legal business for others, and (9) professional misconduct or neglect of duty as an attorney. [4 Cyc. 905 et seq.] Of course many of these grounds are made statutory grounds in the several different states, and the case law reflects the statutes. However, in the instant case there are eight charges, and most of them have as a foundation Section 668, Revised Statutes 1919, which was Section 3 of the Act of 1915. [Laws 1915, l. c. 100.]

From it all there appears the fact, that in the disposition of this case we will not have to travel far beyond the statutory grounds fixed by Sections 668 and 681 of Revised Statutes 1919. The things prohibited by Section 668 are made misdemeanors, and conviction of such is a ground of removal as expressed in Section 681. These general observations bring us to the merits of this case, and these we take in their order.

It should here be further suggested that in the cases it is well said that "this power [the power to disbar], however, is one which should be exercised with great caution, and only for the most mighty reasons." BAKEWELL, J., of the St. Louis Court of Appeals, in State ex rel. v. Laughlin, 10 Mo. App. l. c. 6, says: "The power to disbar an attorney ought to be exercised with the greatest caution, not as a means of punishment, and only in extreme cases; for the decision of a court

disbarring one of its attorney's must have the most dreadful effect upon the social standing and future position of the unhappy man disbarred. The power should only be exercised where the delinquent has shown himself utterly unfit to be a member of an honorable profession and an officer of the court. [See cases cited in Weeks on Attys., notes to sec. 80 p. 140.]''

VI. *The J. M. Parker Case*: Parker was hurt at Jennings, Oklahoma, by the St. Louis and San Francisco Railroad. He was taken to a hospital at Springfield, Missouri. While there he first met one Gray, a claim-agent from the railroad, who tried to settle with him for $1000, which was refused. Parker was on the witness stand in this case, and his testimony does not sustain the charges of the petitioners. One R. C. Robinson was a hired investigator of Sizer & Gardner. He was on a salary to investigate their prospective cases. Much effort was made to show that he was other than what he claimed to be, and that Sizer & Gardner divided fees with him. On this question there was an utter failure of proof. Counsel for petitioner corresponded with both Robinson and Todd, and both wrote him of their connections with Sizer & Gardner, and Robinson, as per a request from such counsel fixed times and places for them to take the evidence. Petitioner's counsel took the testimony of neither. From other testimony in the record these parties were upon salaries as investigators, and in no case was either promised or paid any part of the fees earned by Sizer & Gardner. They performed for Sizer & Gardner the services such as are usually rendered by claim-agents and other non-licensed investigators for railways and other corporations.

*Loan to Client.*

But to return more directly to Parker's case. Parker said that while in the hospital at Springfield employees of the Frisco railroad, the short name for the road which had injured Parker, and which employees were then at the hospital, had spoken of Sizer & Gardner, as good

lawyers, for him to employ. As he left the hospital he chanced to ride from Springfield to Monett with Warren L. White recently elected one of the judges of the circuit court at Springfield, who also spoke well of Sizer & Gardner. Respondents claim that Judge White, in talking over other matters, indicated that Parker desired them, and that the next time Robinson went to Miami, Oklahoma, where Parker then lived, they told him to investigate the Parker case. In the course of time Robinson called upon Parker, who at time of his injury was a brakeman for the Frisco. At the time Parker was out of employment and had a wife and two children. Parker signed up a percentage contract, and says himself that he then stated the condition of his family, and that winter was coming on, and that he needed $100 as a loan to tide him over—that he only wanted it as a loan, to be repaid. Robinson drew a second and independent contract, saying that he would see what Sizer & Gardner would do, disclaiming his authority to make loans for them. Later Sizer & Gardner brought suit at Springfield, Missouri, for Parker in the sum of $40,000, which suit was settled without the knowledge of Sizer & Gardner, by claim agent Gray, for $1500. Parker says that Gray was informed of the loan of $100 and agreed with him to settle the attorney's fees of Sizer & Gardner and this loan. He also says that Gray obtained his private paper from his wife by lying to her. These were the papers turned over and used in this prosecution. Sizer & Gardner got neither the loan nor the fees from Gray, and in the face of Parker's evidence (a witness for petitioners), Gray does not appear as a witness, so far as the index to the record shows. We searched to see what he would say. Sizer & Gardner say they made the small loan because of the destitute condition of Parker's family. Parker says the same. This state of affairs does not merit the disbarment of these respondents. A lawyer can loan his client money without violating either ethics or law. Of course the loan should not be the consideration for the employment. It does not so appear here.

VII. *The Ellis Case*: The petition for disbarment is far from pleading the real facts of this particular case. It begins in the middle of the case. Respondent Gardner is not involved in this charge. Ellis was an employee of the Midland Valley Railroad Company. In an accident he had both legs cut off. He entered into a contract with Sizer to prosecute his case for one-third of the recovery. Sizer brought suit at Ft. Smith, Arkansas, and without Sizer's knowledge or consent a claim-agent of the railroad settled with Ellis for $10,000. Sizer intervened in the case to enforce his lien for one-third of the $10,000. At this point the petition in the instant case begins. It is charged that whilst Sizer's case for his fee was being heard, Jos. Johnson, a lawyer, and J. H. Todd, whom we have mentioned, approached Ellis with a proposition that Sizer would put up a certified check for $5000 if Ellis would permit him to bring an action to set aside the settlement. In view of the ultimate facts the exact details are not material. Mr. English wrote to Todd at Tulsa, Oklahoma, and Todd answered his letter. The purpose of Mr. English was to get Mr. Todd's evidence at some time and place, and Mr. Todd's answer, in the record, shows no disposition to evade giving testimony. He said that he had read and heard much of this disbarment proceeding, and had been visited by a man whom he supposed came from Mr. English's office. In the letter Todd tells English that Ellis lies, if he says that he approached Ellis for either Sizer or Joseph Johnson. He further says that he worked a year for Sizer, as an investigator, on a salary and not otherwise. Of course Todd's evidence was not taken. Robinson says he had no such talk with Ellis, and had no authority to talk for Sizer. Ellis himself says Sizer made him no proposition, and Sizer says that he made no such proposition, and did not authorize either Todd or Robinson to make it, and had never heard of it prior to this action. These facts do not meet the requirements of the law for conviction. We should add that the Arkansas Supreme Court sustained the

*(Margin note: Proposition to Reopen Settlement.)*

validity of Mr. Sizer's contract with Ellis, and also the lien created thereby.

VIII. *The O'Connor Case*: This is another Arkansas case. O'Connor was the step-father of the McCutcheon children. He contracted with Sizer & Gardner to sue for the children, they having been seriously injured at a crossing by the Arkansas Central Railroad

Company. Suit was brought and settled by
Money to          O'Connor for the trifling sum of $5000, after
Live On.          which O'Connor left their place of abode in
Ft. Smith, Arkansas, and went to Oklahoma, where he tried to get a divorce from his wife, the mother of the three crippled children. It should suffice to say that he was thoroughly impeached for truth and veracity, but in justice to respondents further facts should be detailed. O'Connor swears that Harry Davis and R. C. Robinson solicited the case for Sizer & Gardner, and that they as Sizer & Gardner's agents promised him money to live upon. His charge differs from those just disposed of above, in that there is no loan feature. He tries to make out a straight case of getting the case on the ground of giving him money to live upon. O'Connor says that Davis and Robinson came to him and solicited him to give Sizer & Gardner the cases, with promises of giving him money to live upon, as we have stated. We do not have to pass upon the question whether, if these facts were established, the respondents are guilty. We do or should have to pass upon the truthfulness of this evidence. Harry W. Davis had employed Sizer & Gardner in a suit against the Missouri Pacific Railroad Company, and was well pleased with the result of the case. He says that O'Connor sent word for him to come to see him through his uncle, George Dexter  Upon receiving the word he and his uncle went over and saw O'Connor, who inquired as to what lawyers he had in his case against the Missouri Pacific, and as to whether or not they were satisfactory. He told O'Connor that they were good lawyers and that he was well pleased with them. O'Connor requested him to write or wire them

to come down and see him. The uncle, Dexter, confirms all this. Davis got in touch with Sizer & Gardner, but they were trying a case and said that Robinson (their investigator) had work there, and would be down soon, and see O'Connor. Davis says that in two or three days Robinson did come, and he went with him to where O'Connor was at work, and later to the house to see the wife. Davis says that there was no agreement to give O'Connor living expenses or to pay court costs; that what he did was at the request of O'Connor, and he was not soliciting cases for Sizer & Gardner, but did speak a good word for them when asked about lawyers, this, because they had served him well. Davis heard all that passed between Robinson and O'Connor, and he flatly contradicts O'Connor. O'Connor is further contradicted by both Davis and his uncle as to how Davis came to see him. O'Connor testifies that just before the cases were set for trial, he asked Sizer for some loans, but Sizer refused to make them. No court costs were paid by either of the respondents, but attorney Love Grant (who was associated in the cases) testifies that he did pay the filing fees, which was customary in Arkansas where he practiced. Sizer testified that O'Connor did ask him for a loan, which he refused, but at no time ever claimed that either Robinson or Davis promised him money. It should be added there is in the record an affidavit from O'Connor's wife which accords with the evidence of Davis and Robinson, but we do not discover the competency of this affidavit from the record, and hence do not consider it. Upon the facts we cannot convict upon this charge.

IX. *The Holloway Case*: This charge is given in petitioners' statement (which we have quoted in full, but reproduce here) is as follows:

"*The Holloway Case.* That respondents through an agent named Workman solicited one Frank Holloway to employ them as attorneys in an action for personal injuries against a railroad company and represented

that they would pay all costs and advance Holloway money if he needed it."

When you read the record you would not recognize the case described in the foregoing short statement. There was a Holloway Case, and this court is familiar with it, because we passed upon the case. To start with there is not a word of evidence in this record to show that Workman in any way represented Sizer in what talks he had with Holloway. The Holloway Case arose in 1914 and had a checkered career. It was brought at Clinton, Missouri, and handled by Sizer in connection with Mr. Pogue of Clinton and Claude Wilkerson of Sedalia. Respondent Gardner was not in the Sizer & Gardner firm until 1917. Old man Workman did visit Holloway at the hospital in Sedalia. Holloway lost a leg at Calhoun, Henry County, in a railroad accident on the M. K. & T. Railroad, and was taken to this hospital. Workman had lived near Holloway at one time, and called at the hospital twice. At first Holloway did not recognize him, but did when Workman recalled to him the fact of having once lived in the same block. Sizer had handled a case for Workman, with the result of which he was much pleased. He told Holloway that if he had to have a lawyer to get Sizer, and explained his own case. Holloway says that the old man may have said something to the effect that Sizer would pay expenses, and loan him some money if he needed it. On the second visit some such talk was had. After Holloway got out of the hospital he tried to settle his case without a lawyer, and then wrote Sizer to come up and see him. Sizer seems to have had considerable business around Sedalia before and during this time. Sizer in a few days called on Holloway, and they discussed the case and terms of a contract, but no contract was made, Holloway having a lingering hope of a settlement. He wrote Sizer again, and at the second visit the written contract was made. Holloway asked that his young friend Claude Wilkerson be taken in, as also Mr. Poague at Clinton, and that the suit be brought at

*Failure of Proof.*

Clinton.   Wilkerson was introduced to Sizer just after contract was made by Holloway and was then taken into the case.   Holloway, Sizer and Wilkerson all say that there was no agreement to pay expenses or loan Holloway money.   Holloway did say that after the contract was signed, Sizer asked him how he was fixed financially, and when he was informed that he owned his home and had gotten some insurance money for the loss of his leg, Sizer simply replied, "You are all right," or words to that effect.   As there is not a word of proof to sustain the charge of petitioner's petition, we should stop at this point.   We cannot resist, however, to give a few details of this case.   As said it was brought at Clinton, and originally defended by some four or five lawyers, including the late and much-lamented Peyton A. Parks. Judge Calvird sustained a demurrer to the testimony, and plaintiff took an involuntary nonsuit.   Later, upon motion, this nonsuit was set aside, and the case re-instated for trial.   The railroad appealed to this court, and we ruled that plaintiff's case should go to a jury, and thus affirmed the action of Judge Calvird.   Pending the time of this appeal the railroad went into hands of a Federal receiver at St. Louis, and the Hon. James A. Seddon was the referee in bankruptcy   Sizer fought the matter there and got an allowance of $6500.   In the Federal court at St. Louis a re-organization plan was submitted and approved, and general creditors such as Holloway were required to assign their claims to named fiscal agents, and were required to take stock at certain rate in the new railroad company.   Holloway consulted Sizer, and Sizer and Wilkerson told him to go on and get what he could and they would and did release him of all obligations to them.   When Holloway testified in the instant case he had received no stock, but was clinging on to a receipt which some fiscal agent gave him. Sizer spent years of work, and many dollars in expenses in the prosecution, and in the end charged nothing to the unfortunate man.

We should not stop here, because the reason for this particular charge does not occur. Some investigator, either for the railroad, or other interested parties (more probably the railroad, because he showed an M. K. & T. pass), came to Sedalia and sent for Holloway to come to the Hotel Terry. Holloway was shown the pass and told that he wanted him to give a statement as it might help him to get his $6500. Holloway detailed his case, and this fellow wrote out duplicate statements, and Holloway says that he presumed that he had written down what he had said, and never discovered that the fellow had put in things which had not been told, until after he got home and read it over. He also says that he never saw the fellow afterward and could not recall his name. This affidavit, whether procured by an M. K. & T. agent or by Pendell, the selected agent for getting affidavits against lawyers, found its way into the hands of petitioners, and was the basis of this charge. The charge fails for want of proof.

X. *The Chaffee Case*: Chaffee was injured in the M. K. & T. Railroad shops at Parsons, Kansas, having one hand injured. In this case there is a conflict of facts upon the question as to whether an alleged agreement to loan or advance money was before or after the contract. Chaffee says he was **Agreement to Furnish Money for Support.** upon the streets of Sedalia and says that he met a man, whom he did not know, but who upon finding out how his hand was injured, suggested that he see Claude Wilkerson, and showed him Wilkerson's office. Chaffee is not certain whether the man went into the office with him or not, but Wilkerson says no one came in with Chaffee, but Chaffee told him a man down on the street recommended him, but when asked by Wilkerson the man's name, said that he did not know. Chaffee said that Wilkerson told him that he and Sizer were partners, and that they would take his case on a per cent basis and pay the expenses and furnish money upon which he and his family could live

until he could realize from the railroad. Both agree that no contract was entered into at that meeting. Upon this point Wilkerson says that he was not sure from the facts whether the fellow's action was under Federal Employers' Liability Act, or under the Kansas Compensation Law. If under the latter there was not much to the case and he did not care for it, and to give himself time to more thoroughly consider the law he told Chaffee to see what the claim-agent would offer him. Chaffee did this, and when he returned Wilkerson says that he told. him that he thought he had a case under the Federal law, but that Sizer was a good lawyer in such cases, and that he was going to take Sizer in on his case. He denies that he ever told Chaffee that they were partners, and in fact they were not and never had been. Each had taken the other in on many previous cases. When Chaffee said the claim-agent only offered him $300, Chaffee says that Wilkerson guaranteed him the $300, but Wilkerson says the talk accorded with the written contract, which was then and there signed. The contract says nothing about paying costs or advancing living expenses, but as to the $300 says:

"Second parties hereby accept said employment, and agree to investigate said cause of action, at their expense, and if necessary will prosecute said cause of action through all the courts, to the end that substantial remuneration be had for said injury, and for their attorney's fees and expenses, the second parties shall have fifty per cent of all sums collected, either by suit or compromise, and a proportionate part of said cause of action is hereby assigned to the second parties to secure same, *however, the said first party's proportion shall be at least three hundred dollars before the said second parties shall receive anything for their services,* and in case nothing is recovered then parties of the second part shall have nothing for their fees or expenses."

Finally being pressed on cross-examination, the following occurred: "Now then after you had all this conversation and it was reduced to writing this is a copy

of it, Exhibit 1? Answer: Yes, sir.'' The witness per-sisted throughout that he did not understand that the moneys advanced to him by Wilkerson were loans, but he indicates at one place that he thought there must be some writing to make a loan. His conception of a loan was not clear. This money portion of the charge we will elaborate later. Both agree that Sizer did not sign the contract, but that Wilkerson signed Sizer's name. Both agree that Sizer was never present at any talk prior to the contract, and whether Wilkerson was authorized to sign Sizer's name to the contract is immaterial, because the contract, as written, is both legal and ethical. Both Sizer and Wilkerson say that Wilkerson had no author-ity to pledge or promise the payment of money by Sizer. Chaffee claims that Wilkerson told him that Sizer would pay his living expenses. Wilkerson denies this state-ment, and adds that he had no authority to make such a promise for Sizer. Wilkerson says that after he took the case he was continuously harassed by Chaffee for money. That Chaffee said his wife and children were suffering and he was out of work. That he, personally, some time after the contract, loaned sums of money, aggregating $80, to Chaffee for his family to live upon, but that Sizer knew nothing of these. That it was his case and not Sizer's case, although he had taken Sizer in to help try it because he knew it was a close case. Wil-kerson explains some letters in which he indicated Sizer had furnished the money, but that he did that to ''stall off'' Chaffee who was persistently asking for money. Right here it should be said that the money was sent by Wilkerson, and all the requests for money were made to Wilkerson. Upon this all agree. A change of venue was taken in the case, and an answer filed. The answer pleaded that the case was one under the Kansas Com-pensation Act, and Sizer says that he concluded that such was the case, and had a talk with the claim-agent, and told him to go to Parsons, and make a fair settlement with Chaffee, and he would dismiss the case. He did dismiss the case, and the claim-agent did settle with

Chaffee at Parsons, Kansas, but Chaffee says he could not remember what he got in the settlement. When the case was dismissed, Sizer says he for the first time learned that Wilkerson had loaned Chaffee $80. Sizer was writing Chaffee what he had said to the claim-agent, and about the dismissing of the case, and further that they would release him from the contract for fees, as he probably would not get much out of it. He says that Wilkerson suggested that he ask Chaffee to send him (Sizer) just the $80 loaned him, as he would come nearer paying him than he would Wilkerson. In this way he explains that portion of his letter, which is the only thing connecting Sizer with even a loan. Even Chaffee says he intended to re-pay Wilkerson, but understood from the claim-agent that Sizer and Wilkerson had gotten their part. This only indicates that he, in fact, understood it as a loan. The $80 was never paid, and Sizer said that he and Wilkerson had been in so many cases together that he paid Wilkerson half of his loss, but was under no obligation to so do. Gardner is not involved in this charge, and we do not think Sizer should be disbarred under these facts.

XI. *The Childers Case:* This charge is of easy disposition. The petitioners undertook to prove the charges by Childers, at Muskogee, Oklahoma. Among other things (after Childers had come into the room where our commissioner was taking testimony) the following occurred:

"The Commissioner: I have explained that and he has refused to be sworn. Do you still refuse to be sworn or, affirm?

"Mr. Childers: Absolutely, I do not intend to be sworn. I don't want to be involved in this thing.

"Mr. English: I concede the witness has a right to do that; Your Honor.

"The Commissioner: You may be excused, Mr. Childers."

Mr. English then offered, in lieu of the witness's testimony, an *ex parte* affidavit said to have been made

by the witness to the claim-agent Gray, heretofore spoken of in another case, on October 26, 1920. Our commissioner was directed to take all evidence subject to the objections made, so over valid objection duly made, this statement, in form of an *ex parte* affidavit, is in the record. It is not competent, and counsel do not seriously contend that it is competent. This charge fails for want of proof.

XII. *The Wiley Case*: This charge is likewise of easy disposition. It must fail for lack of proof by petitioners. Thomas R. Wiley, an elderly gentleman, was injured by the Frisco Railroad. He was in a hospital at Ft. Smith, Arkansas. Wiley says that he never met Sizer & Gardner until he saw them when he was giving his testimony in this instant case. He never employed them or tried to employ them. Sizer & Gardner say they never knew that there was such a case, and authorized no one to speak for them in the matter. Wiley lived in the same town and knew Harry W. Davis, of whose testimony we have spoken before. He says Davis and a number of his acquaintances (especially among the railroad men) called upon him at the hospital. While there Davis spoke of the case which Sizer & Gardner handled for him, and suggested that if he wanted good lawyers for that kind of a case to get them. Davis was an acquaintance of Wiley. Wiley further said (and this is the point to the matter) that Davis said Sizer & Gardner paid him $75 per month whilst his case was pending. This of course was pure hearsay, and was objected to on that ground, and such objection must be sustained. This out, there is no force to Wiley's testimony. It might be suggested that Davis had previously testified that Sizer & Gardner had not advanced money to him, nor did he get any thing for recommending them—that he did this because they had handled his case successfully. After Wiley testified he (Davis) was again examined and denied this part of Wiley's evidence.

One Scott, a railroad man, and an acquaintance of Wiley, also called, and he spoke highly of Sizer &

Gardner, but there is no proof that he ever had any connection with Sizer & Gardner. Mrs. Wiley said that a man called at the house, and said his name was Robinson and that he was a field man for Sizer & Gardner; that he offered to buy the claim for $5000. She makes it clear that it was an offer to buy the claim, and not an offer for a contract of employment. The impression tried to be left is that this man was R. C. Robinson, the investigator of Sizer & Gardner. First, Mrs. Wiley did not know Robinson and of course could not swear that it was R. C. Robinson. Secondly, Sizer & Gardner say that they never knew there was such an accident, or such a case, and had not authorized either Davis or Robinson to do any thing in the case. This should and does suffice, but we will add that Mr. English wrote Mr. R. C. Robinson about the case, and of his desire to get his evidence. Robinson wrote him fully about what his testimony would be, and expressed a willingness to give it at any convenient time and place. Mr. English's first letter to Robinson was of date December 12, 1923. The evidence of Wiley and wife was taken at Muskogee on December 8, 1923, just four days before this first letter. December 19, 1923, Judge English (in a second letter) thanks Robinson for his willingness to testify, and asking Robinson if he should be in Springfield to call upon McCammon and talk to him, or if in Kansas City to call upon him (English) for a talk as to the facts. Robinson did not get to either Springfield or Kansas City, and later wrote the' letter as to the facts, which we have mentioned above. In this letter as to the Wiley matter he says:

"In the third place I do not know any parties by the name of Mr. and Mrs. Wiley, whom your testimony, or that of a Mrs. Wiley, connects me with soliciting, or offering to buy her husband's claim for Sizer & Gardner. I specifically deny that I was ever at her home in Ft. Smith or anywhere else and tried to get her husband's claim in any way. I deny that I ever offered Mrs. Wiley

$5000 for her husband's case or to assign it to Sizer & Gardner. I will say it has come to my attention on numerous occasions that the railroad companies have sent men out representing themselves to be me or Sizer or Gradner to crippled railroad employees telling them that there was no liability to their cases and could not handle it, or telling them that they could get them a small sum of money, and then in a day or two the claim-agents would follow up and settle with the unfortunate fellow for a few dollars.''

Of course this letter is not evidence, but it explains why petitioners did not take Robinson's evidence. There can be no conviction of the charges relating to the Wiley case. They fail for want of proof.

XIII. *The Amber Case*: .This is an attempt to charge subornation of perjury. This and the charge of dividing fees with unlicensed persons for procuring cases for them, are the serious charges in the lengthy petition. As we have pointed by the Act of 1915, it was made a misdemeanor for a lawyer to divide fees with one unlicensed to practice law. On the charges as to dividing fees with unlicensed persons the case fails for want of proof. Sizer & Gardner had as much right to employ investigators (not licensed to practice law) at so much per month as the railroad or other corporations (through the legal department or otherwise) have to employ unlicensed persons as claim agents to look up evidence and make adjustments of claims, if they could. Both would be within the law. Each may act unseemly in the performance of their duties, but what evidence there is in this record rather tends to show that the claim-agent beat the investigator to the hospital.

But to the Amber Case. In 1918 there were three brothers by the name of Amber working for the Frisco at Monett, Missouri. The younger boy, Ben L. Amber, was charged before a justice of the peace at Monett, along with three others, with burglary and larceny from the Frisco. A car had been opened and some shoes

taken.   Ben Amber claimed that he bought two pairs
of the shoes from Keithley, one of the other parties, and
sold them to two negro porters. ˙ One night the deputy
constable came down to the house and told Ben he want-
ed him to come up to the city hall, but Ben said he was
going to church that night, and the deputy said all right
go on, and report to-morrow morning.   Both say no
warrant was read or arrest made. Keithly was a brother
of. the young lady, then the stenographer of Sizer &
Gardner.   In this way Mr. Sizer was interested.   Attor-
ney Smith also was interested in Keithley.

Ben Amber concluded to go up town instead of to
church the night the deputy constable was down to the
house.   He found neither the deputy nor the Frisco
special agent that was with him.   He did find a special
agent with a sack of the supposed stolen shoes, and
pointed out to him the kind he claimed to have bought
from Keithley, and gave the names of the two negro
porters to show he sold them.   He appeared the next
morning, and the other boys waived the preliminary, but
he told the justice that he had stolen no shoes, and was
given a preliminary trial and bound over to the circuit
court.   This is preliminary to the real facts charged in
the petition, although these facts are in this record.

Amber gave bond (as he says he thought as a wit-
ness) for his appearance at the circuit court.   It was
intimated to Ben's older brother that if Sizer & Gardner
were disposed of as counsel, the whole matter could be
adjusted and Ben keep his place with the railroad.   On
the first day of the circuit court at Cassville Ben and at
least one of his brothers went down, and through this
brother and a local Frisco attorney, James Talbert, and
some other representative of the Frisco, the whole mat-
ter was adjusted.   The prosecuting attorney filed an in-
formation charging petit larceny, and so far as Ben
Amber is concerned his plea of guilty was entered by
Mr. Talbert, the local attorney for the Frisco.   In person
Amber never pleaded guilty.   Nor was there a warrant is-
sued upon this information, so he was not arrested up-

on it.  He was told by his brother that the matter was all
fixed up and he could go on back to his job with the
Frisco, which he did.

Sizer was upon the appearance bond taken before
the justice of the peace.  Later the brother gave Sizer
the money to meet the fine and costs, saying to him not
to tell the "kid," meaning Ben L.

Later Ben L. Amber was injured (a foot cut off) by
the Frisco, and he got Sizer & Gardner to sue for him.
We now quote from the counsel for the defendants in
this case, as their statement accords with the facts:

"The most important charge made against defend-
ants other than the unlawful division of fees with persons
not lawyers, and which has been practically abandoned,
is the charge of subornation of perjury in what is de-
signated as the Amber case.  More evidence was taken in
regard to that charge than any other.  The substance
of the charge is, that defendant Sizer asked one B. L.
Amber, in the trial of his damage suit against the Frisco
Railroad Company, questions which petitioner claims the
witness answered falsely, and which answers Sizer knew
were false and expected the witness to answer falsely.

"The facts as to this matter are briefly, that defend-
ants as attorneys for Amber, brought his suit for per-
sonal injuries against the Frisco Railroad Company, and
same came on for trial at Lamar, Missouri.  The plain-
tiff Amber testified as to his injuries and the defendant's
negligence.  Attorney E. P. Mann for defendant railroad
company, in order to discredit his evidence, asked the
witness Amber upon cross-examination if he had not been
convicted or plead guilty to petit larceny.  The witness
answered no.  Mr. Mann then went more into particu-
lars and asked him if he was not arrested on such charge,
and the witness said he had never been arrested in his
life.  Mr. Mann then produced a certified copy of the
court record of Barry County, showing a plea of guilty
by B. L. Amber to the charge of petit larceny in that
court, and a fine of $10.  The witness still denied that
he had plead guilty or paid any fine, and said he did not

know of such a record being made. As we have stated, this matter was brought out by Mr. Mann, and not by Mr. Sizer.

"There was a mistrial at Lamar and the case went to Webster County and was again tried at Marshfield before Judge C. H. Skinker. At this trial defendant's attorney, Mr. Mann, did not question the witness as to his plea of guilty, but put in evidence the court record only of such plea. Attorney Sizer then elicited from the witness the same evidence brought out by Mr. Mann at the trial at Lamar, the witness again testifying, in answer to questions by Judge Skinker, that he had never plead guilty and was never arrested on such charge.

"On the hearing of the present case before the commissioner the petitioner put in evidence a transcript of the evidence given by Amber in the two trials at Lamar and Marshfield, a certified copy of the proceedings had before the justice of the peace at a preliminary hearing on a charge of burglary and larceny, and certified copy of the circuit court proceedings showing the plea of guilty to petit larceny in the case of State v. B. L. Amber et al."

The witness, Ben Amber, in this case, says that neither Sizer nor Gardner tried to influence his testimony in the damage suit. He also, in this very case now before us, testified to the same facts that he did at Lamar and Marshfield in the damage suit case. Sizer was no doubt cognizant of the facts we have detailed, because he was present at the preliminary hearing and heard what Mr. Mann developed at Lamar. Judging from his testimony Amber knows but little of court proceedings. Under these facts it cannot be said that Amber has been guilty of perjury, and if so Sizer cannot be guilty of subornation of perjury. As an actual fact the boy never plead guilty at either place. At Monett he denied his guilt. At Cassville the Frisco attorney entered a plea of guilty without his knowledge. The prosecuting attorney says that, in misdemeanors, it was customary for an attorney to enter an agreed plea of guilty

even in the absence of the defendant. Such is often done in the practice. Ben Amber says he was in the back of the court room all the time, although his brother thinks he was closer up to the judge. He says he was not arrested at either place, and the evidence so shows. No court would convict Ben Amber for perjury upon this evidence, or permit a conviction to stand if one was returned by the jury. If so, the charge of subornation of perjury as against Sizer & Gardner—more particularly Sizer, because Gardner is not mentioned in this charge— must fail.

Upon the facts in this case F. P. Sizer and H. A. Gardner should be exonerated and discharged from the charges in this petition contained, and said petition dismissed.

It is so ordered. All concur, except *Walker, J.*, absent; *David E. Blair* and *James T. Blair, JJ.*, concur in result, in separate opinion.

### On Application to Amend Petition.

The original petition in this case contains a great many charges. We heard and overruled a challenge to our jurisdiction. The pleadings were thereafter made up and a commissioner appointed to take evidence. Complainants thereupon began the taking of evidence to support their divers charges, and the charges are numerous, as stated above. Finally the evidence reached a point when complainants sought an inspection of the private books and papers of the accused. By verified statement, undenied by complainants, counsel for accused has given us to understand that complainants announced that they were through taking evidence in chief, except such evidence as they might want to use after the inspection of the books, if they procured such inspection, and except such evidence as might be properly used in rebuttal. With this announcement by complainants, they filed in this court their application for an inspection of the private books and papers of the accused, and pending a ruling thereon the accused proceeded with their evi-

dence upon the strength of the announcement aforesaid. Shortly this court refused to order an inspection of the books and papers.

In this situation of the case this application to amend is made. It should be refused for two reasons, (1) the matter sought to be incorporated is not only stale, in a sense, but the allegations of the substance are indefinite and uncertain, and (2) the complainants should have kept faith with their announcement (upon which accused relied) when they concluded their evidence in chief, reserving only the right to introduce such evidence as might be revealed by the sought inspection. If they have no evidence now upon which to predicate a conviction, the tendered amendment gives little hope for better results. If they have evidence now, upon the sundry charges in the present petition, there is no use of such an amendment, and its attendant costs in the taking of further evidence. The motion to amend is denied. *David E. Blair, James T. Blair, White* and *Woodson, JJ.,* concur; *Ragland, J.,* dissents.

DAVID E. BLAIR, J. (concurring).—I am of the opinion that this court has no jurisdiction in this case, and for that reason concur in the result of the dismissal of the petition. If, however, we have jurisdiction of the case, as a majority of the court rules, I think the case properly disposed of upon the facts. *James T. Blair, J.,* concurs in these views.