(No. 33700.— ▮▮▮▮▮▮▮▮▮)
In re James P. Moore, an Attorney, Respondent.

*Opinion filed March 22, 1956—Rehearing denied May 22, 1956.*

REYNOLDS M. EVERETT, of Galva, for commissioners.

JOHN E. TOOMEY, of Chicago, for respondent.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This disciplinary proceeding is heard upon the exceptions of respondent James P. Moore to the findings and recommendations of the Board of Governors of the Illinois State Bar Association sitting as commissioners of this court.

The sole issue is whether the commissioners' findings that respondent was guilty of the charges of solicitation and advancement of funds to a client were supported by clear and convincing proof and warranted his suspension from practice for one year.

From the record it appears that respondent was admitted to practice law in Illinois in 1934, and was employed in the legal departments of the Aetna Surety and Lumbermen's Mutual Insurance companies until September, 1949, when he entered the private practice of law in Waukegan, which practice was predominantly in the personal injury field. On December 1, 1949, respondent was appointed public administrator of Lake County and held office until his resignation in February, 1953. On March 20, 1953, the vice-president of the Lake County Bar Asso-

ciation received a letter sent by a Mississippi attorney to the judge of the probate court of Lake County protesting that respondent was acting as public administrator for the estate of Exer Coggins, a resident of Lake County who formerly lived in Mississippi. Thereafter the Illinois State Bar Association was asked to make an inquiry.

The original complaint was filed on October 17, 1953, by the inquiry division of the Illinois State Bar Association and contained three counts. Although two additional counts were filed, the Board of Governors on reviewing the report of the committee on grievances sustained only counts 2 and 5, hereinafter referred to as the Harbin and Williams counts, relating to the offenses of solicitation and advancement of funds, and recommended suspension from practice for one year.

With reference to the Harbin count, it appears that respondent, as public administrator, was charged with the administration of the estate of Exer Coggins, who was killed in an automobile accident in Wisconsin. Respondent assigned Don Sherman to investigate the accident and secure data relating to Coggins's heirs. Sherman interviewed Harbin, a passenger in Coggins's car and the only eyewitness to the accident, at the hospital. According to Harbin's testimony Sherman introduced himself as respondent and said that he would like to help Harbin, who replied that he wanted to turn the case over to an attorney in Mississippi. Sherman left with Harbin a portion of respondent's letter head, on which the name Don Sherman was written. After remaining at the hospital for four days, Harbin went to the home of his brother in Zion, Illinois, where, according to his testimony, Don Sherman visited him again and explained that he was told by the Mississippi attorney that it would be all right for him to have Harbin's case, and that, at the instance of Sherman, Harbin signed a written contract for respondent to handle the case. No such written contract was offered in evidence, and Harbin

admitted that some 12 days after the accident he telephoned Sherman and went down to the office where he found respondent, and retained him after he found out who respondent was. Harbin testified further that respondent advanced him approximately $700 during the pendency of his case.

In rebuttal respondent testified that he had asked Sherman to investigate the accident involving Coggins and obtain information of heirship. The investigation involved two trips to Mississippi, for which Sherman was paid $250 based upon a daily rate of $35 a day and travelling expenses. Respondent testified further that he first met Harbin in his office in October, 1953; that he was asked by Harbin if he were handling the case for the Coggins family and if he would handle his case also; that there was no written contract but only an oral agreement between the parties. He explained that the advances to Harbin amounted to some $400 and were given to pay local Wisconsin counsel to get Harbin out of a Kenosha jail where he was held on a robbery charge, to help him at the time of his marriage, and when his car was taken from him for lack of payment. Respondent stated that the advances were made because Harbin was the only surviving witness to an accident in which respondent's other clients were involved, and consequently he felt that he had to treat Harbin carefully and the latter knew it.

With reference to the Williams count it appears that Matt Williams, a 50-year-old iron molder employed by the Nash-Kelvinator Company, was injured in an automobile accident on October 6, 1950, and was hospitalized at the St. Therese's Hospital in Waukegan for some three days, after which he went to a friend's home. According to Williams's testimony, respondent called him on the phone to ask for his case, and later came to the home where he was staying and asked him if he wanted a good lawyer, stating that he could get him more money than he ever had in his life.

Complainant also offered the testimony of Joseph Kaufer, a lawyer, who testified at length as to matters that took place outside the presence of respondent, involving a conversation with Kaufer's client who was injured in the same accident as Williams, from which Kaufer deduced that respondent solicited the Williams case. Kaufer also related how he took Williams to respondent's office and accused him of misconduct. Respondent not only failed to deny or explain his solicitation but promptly offered to relinquish his interest in the Williams case. This bore a strong implication of guilt.

In rebuttal respondent explained that on a Sunday afternoon, in the company of his wife, he stopped to see Williams to collect a hospital bill for the St. Therese's Hospital, which he represented. He gave Williams his card, informed Williams that he represented the hospital, and asked Williams to assign the hospitalization insurance carried by Nash-Kelvinator employees to the hospital, since in many cases such insurance, payable to the individual, was not paid over to the hospital. Williams agreed to go to the hospital to execute the assignment. In his testimony, moreover, Williams admitted that respondent stated that he represented the hospital and did ask Williams to assign his insurance. Furthermore, after respondent settled the case for $600 and paid the hospital bill, he refunded to Williams the amount of the hospitalization check which had been assigned.

Respondent's wife corroborated his testimony and stated that she went with him to North Chicago in October, 1950, to see two colored gentlemen, and that a conversation took place beside the open door of their car between her husband and Williams with reference to the payment of the hospital bill.

Respondent also offered in rebuttal a letter from the hospital authorities stating that he had been requested by the hospital to interview Williams and direct him to make

an assignment of any hospitalization insurance he carried. That letter, written by one of the Sisters, further stated: "I recall this particular matter because Mr. Joseph Kaufer called and asked if Mr. Moore had a right to call on Matt Williams. This hospital has given Mr. Moore the right to call on patients, and in many instances have advised them that Mr. Moore will contact them about their delinquent bills."

On the basis of substantially the foregoing evidence the commissioners found respondent guilty of the charges of solicitation and advancement of funds, and of conduct that brings the legal profession into disrepute; and, therefore, recommended that he be suspended from practice for one year.

Respondent has excepted to those findings, and contends that they are not sustained by the requisite clear and convincing proof; that he did nothing but what any reasonable, practical and competent lawyer would have done under similar circumstances; that the evidence establishes that he did not solicit either of the cases, but on the contrary agreed to represent the individuals mentioned in counts 2 and 5 because their cases were intimately related to cases in which he was already representing clients, and in no respect involved a conflict of interests; and that the advancement of funds had no relation whatever to the alleged solicitation, but was injected into the commissioners' findings only to prejudice his cause.

In determining whether the findings and recommendations of the commissioners should properly be sustained, it is established that although the canons of ethics are not laws, they do constitute a safe guide for professional conduct, and that, in the interest of protecting the public, disciplinary measures may be imposed if the canons are not observed. (*In re Mitgang,* 385 Ill. 311; *In re Melnick,* 383 Ill. 200, 206.) However, the power to discipline is not arbitrary, and must be exercised with legal discretion and

caution. Proof of the charges must be established by clear and convincing evidence, and the record must be free from doubt not only as to the act charged, but as to the motive with which it was done. *In re Lasecki,* 358 Ill. 69; *In re Donaghy,* 402 Ill. 120, 123.

The charges presented against respondent herein were instituted by the Lake County Bar Association at the instigation of a Mississippi attorney, and relate to solicitation of two clients and the advancement of funds to one of those clients. Solicitation of cases, while not fraught with moral turpitude, is, nevertheless, inimical to the good reputation of the bar and likely to bring the profession into disrepute, and therefore has been deemed to warrant suspension under some circumstances. (*In re Veach,* 1 Ill.2d 264.) Courts, however, are reluctant to expound a fixed rule of what constitutes solicitation of legal business to warrant disbarment or suspension.

With reference to the charges relating to the Harbin case, it is clear that the employment of an investigator is not unethical *per se,* and it cannot be inferred from such employment that the attorney is engaged in ambulance chasing. (*In re Mitgang,* 385 Ill. 311; *In re Donaghy,* 402 Ill. 120.) Respondent's payments to Don Sherman for his services were based upon the rates paid investigators and were paid irrespective of recovery in the case and were in no way contingent upon recovery, and therefore his employment could not of itself be deemed improper.

The evidence is controverted as to whether Sherman represented himself as Moore and asked Harbin for his case. The only evidence in support of that charge is the testimony of Harbin. In denying the charge, as hereinbefore noted, respondent explained that Sherman visited Harbin to investigate the accident in which Exer Coggins was killed, since respondent, as public administrator, represented the Coggins estate, and Harbin was the only surviving eyewitness to the accident. Under those circumstances, cor-

roborated by the testimony of Sherman, it is apparent that it was advantageous to respondent's client, the Coggins estate, that respondent have Harbin's good will, and even that respondent represent Harbin. Hence, if respondent, or Sherman, on his behalf, did act aggressively in this matter, it was not done with improper motives.

Moreover, inasmuch as the paper left by Sherman on his first visit to Harbin bore Sherman's own name on it, thereby suggesting that Sherman did not represent himself as respondent; and since Harbin admitted in his testimony that he agreed to have respondent represent him when he found out who he was, it does not appear that there was any misrepresentation or deceit practiced on Harbin. Respondent's conduct, furthermore, in no way infringed the legal rights of any other attorney, since there was no evidence that the Mississippi lawyer ever had a contract with Harbin, written or oral.

With reference to the charge of solicitation in the Williams case, it appears that, in rebuttal of Williams's testimony that respondent telephoned and asked for his case and then came out to see Williams, respondent offered the explanation, supported by a letter written by one of the Sisters of the St. Therese Hospital, that respondent went to see Williams at the request of the hospital authorities to ask him about the payment of his hospital bill and to procure an assignment of Williams's hospitalization insurance. Moreover, Williams admitted that respondent informed him that he came to collect the hospital bill, and requested him to assign his hospital insurance, which he did.

Under these circumstances we cannot agree with complainant that this was an unusual course of conduct for respondent, particularly in the light of the hospital practice of demanding such assignments, since hospitalization payments made to individuals are not always forwarded to the hospital. It may be that respondent, after discussing the hospital bill, offered to accept Williams's case since it

would also be to the interest of the hospital if Williams were to recover additional funds for his injury. We cannot approve of respondent's conduct even though his hospital ruse gave him a basis of introduction and afforded a laudable motive for proper representation so that money would become available for the payment of the bill which he had for collection. However, the instant transgression does not approach the venality and moral turpitude appearing in the *Veach case* so much relied upon by complainant. In that case the complainants against Veach were his former clients, and the evidence with reference to solicitation was exhaustive, rather than predicated on two instances as in the case at bar. Veach maintained no office, would neither try cases nor employ able counsel to try them, would solicit both sides of cases, and would betray clients by quick settlements far below the sum to which the clients would normally be entitled. In addition, he obtained contracts of employment from injured persons while they were in the hospital under the influence of pain relieving drugs and in no condition to transact business.

With reference to the charge of advancement of funds to Harbin during the pendency of the litigation complainant contends that such conduct violates canon 42. That canon provides: "A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience, but subject to reimbursement."

In the instant case respondent made no practice of advancing money to clients, but loaned sums to this particular client who was also the sole eyewitness in an accident in which another client was killed. The payments were made to get the witness out of jail, to help him out at the time of his marriage, and in connection with payments on his car; they were not made as a means of soliciting the case, or in connection with any agreement to purchase an interest in the litigation. Respondent was confronted with an indi-

vidual who recognized his indispensability as a witness in the principal action involving the Coggins estate, and who was not reticent in using threats and demands for money. Respondent realized that it was important that Harbin not only remain out of jail and available as a witness but that he should not become unfriendly. Under the circumstances we would deem it harsh to condemn respondent for making the advancements. Certainly such conduct is not of such discreditable character that disbarment or suspension should follow. *In re Donaghy,* 402 Ill. 120, 135.

On the basis of our analysis we fail to find in this record evidence of solicitation and other improper conduct of such clear and positive character that suspension should follow. Consequently the report of the commissioners must be rejected. However, we are of the opinion that respondent's conduct warrants censure.

*Respondent censured.*