**In the Matter of John RUFFALO, Jr.**
**Misc. No. 269.**

United States Court of Appeals
Sixth Circuit.
Dec. 29, 1966.

8. 28 U.S.C. Section 2255; Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962).

Craig Spangenberg, Cleveland, Ohio, and Charles Alan Wright, Austin, Tex., for John Ruffalo, Jr.

Walter A. Porter, Dayton, Ohio (P. Paul Pusateri, Wilmington, Ohio, John R. Welch, Columbus, Ohio, on brief, amicus curiae), for Ohio State Bar Ass'n.

Russell T. Williams, Youngstown, Ohio, for Mahoning County Bar Ass'n, amicus curiae.

Before O'SULLIVAN, PHILLIPS and EDWARDS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Upon the Supreme Court of Ohio's certification to us that respondent John Ruffalo, Jr., had been indefinitely suspended from the practice of law, we ordered that "John Ruffalo, Jr., show cause if any he has, on or before May 12, 1965, why he should not be stricken from the roll of counsel of this Court."

After extensions granted at the request of respondent, we received his response and brief, as well as a brief amicus curiae by the Ohio State Bar Association in support of the Ohio Supreme Court's order, and the cause has now been argued to a panel of this Court.

In 1962, the Mahoning County Bar Association filed with the Ohio Board of Bar Commissioners on Grievances and Discipline, charges of professional misconduct against respondent Ruffalo. The said Board is made up of seventeen members of the Ohio Bar, chosen, one each, from Ohio's seventeen judicial districts. They are appointed by the Supreme Court of Ohio, pursuant to its Rule XXVII(1) and (3) [1], 167 Ohio St. lxxvii, and act as an arm of that Court.

Fourteen alleged instances of misconduct made up the charges against respondent. The Board of Commissioners convened a panel of three of its members to take evidence on these charges and make an initial report. The charges covered generally acts of solicitation of FELA cases, maintenance of persons asserting claims, attempted bribery, and hiring a railroad employee, Michael Orlando, to act as an undercover agent to assist Ruffalo in soliciting and investigating cases against various railroads, including Orlando's employer, the B & O Railroad.

The panel conducted hearings which extended from December 26, 1962, to August 16, 1963, testimony taken comprising 1,034 pages of transcript. The panel report sustained seven and dismissed seven of the charges. It was unanimously adopted by the seventeen member Board of Commissioners. The charges sustained involved solicitation, maintenance of clients, attempted bribery to dissuade a witness from testifying against Ruffalo, and the use of Orlando as an undercover agent.

The Findings of Fact, Conclusions and Recommendation of the Board were returned to the Ohio Supreme Court. The Recommendation of the Board was that "Respondent be disbarred." The Ohio Court sustained charge 8, maintenance of clients, and 13, use of the undercover agent Orlando. It gave judgment that Ruffalo "be suspended for an indefinite period of time from the practice of law." Mahoning County Bar Association v. Ruffalo, 176 Ohio St. 263, 199 N.E.2d 396, 8 A.L.R.3d 1142 (1964). Certiorari was denied by the Supreme Court of the United States. Ruffalo v. Mahoning County Bar Association, 379 U.S. 931, 85 S.Ct. 328, 13 L.Ed.2d 342 (1964). Five members of the Ohio Court joined in the majority opinion, a sixth member concurred in the result, and the seventh dissented. As to five of the charges sustained by the Board of Commissioners covering solicitation, and attempted bribery to dissuade a witness from testifying against Ruffalo, the Ohio majority said,

1. Now Rule XVIII(1).

"The members of this court are not in agreement as to whether the facts are as the Board of Commissioners recommended they should be found with respect to some of the other charges against respondent."

In deciding that Ruffalo should be suspended from practice, the Ohio Court, in addition to its consideration of the current charges, recited and took into account the fact that in 1957 Ruffalo had been found "guilty of unprofessional conduct in his office as an attorney at law * * * in that he did by and through duly authorized agents and employees solicit professional employment from sundry people."

Following the Ohio Supreme Court decision, the United States District Court for the Northern District of Ohio, Eastern Division, pursuant to its own rule, commenced an inquiry as to the fitness of Mr. Ruffalo to continue as a practitioner in that Court. The District Judge had before him the record and proceedings which culminated in the decision of the Ohio Supreme Court. He disagreed, however, with that decision and refused to suspend Ruffalo from practice in the District Court. In re Ruffalo, 249 F. Supp. 432 (N.D. Ohio, E. Div. 1965). However, he withheld the entry of a final order, reciting that "In the event that the Sixth Circuit Court of Appeals reaches a different conclusion, this Court will reconsider its findings." The matter before us is not an appeal from the said District Court, but is our own consideration of Ruffalo's standing as a practitioner in this Court.

We should preliminarily observe that our own Rule 6(3), prior to recent amendment, could be read as automatically striking from our roll of counsel the name of any lawyer disbarred in any court of record. It has been amended and we consider this matter in keeping with the requirements and admonitions of Theard v. United States, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957) and Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917). These decisions forbid Federal Courts from acting in total reliance on a state judgment. We have before us, and have reviewed, the entire record developed by the Ohio proceedings, but think it proper to dispose of the matter primarily upon the charges on which the Ohio Court disciplined Mr. Ruffalo.[2] The facts as to these are not in dispute. We consider whether we find insupportable the Ohio Court's determination that such facts disclosed unprofessional conduct warranting the discipline imposed and whether they warrant similar discipline by us.

The facts as to charge No. 8 are that Ruffalo, during the pendency of their FELA cases, advanced living expenses to three clients. This conduct was found to offend Canons 10 and 42 of the Canons of Professional Ethics. Canon 10 declares that:

"The lawyer should not purchase any interest in the subject-matter of the litigation which he is conducting."

and Canon 42 provides that:

"A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation. He may in good faith advance expenses as a matter of convenience, but subject to reimbursement."

On this subject, we set out the following extract from the Findings of the Board of Commissioners:

"While it may be questioned whether or not an occasional advance or loan by a lawyer to a client constitues a violation of Canon 10 or Canon 27, it is clear that where such advances are frequently made to various clients over an extended period of time, such prac-

---

2. Our failure to discuss them should not be construed as indicating that we disagree with or find unreliable the other findings of the Board of Commissioners. We cannot accept a contrary assertion in the dissenting opinion. We set out as an appendix hereto the Board of Commissioners' reports on charges 3, 8, 9, 10, 11 and 12, all of which were sustained. The appendix does not cover charge 13 inasmuch as we discuss it at length herein.

tice does establish the violation of Canon 10 in that the lawyer acquires an interest in the subject matter of the litigation which he is conducting, beyond the payment of his fee. Moreover the practice constitutes an indirect form of solicitation in providing an inducement to seek-out such lawyer for employment for reasons unrelated to their professional competence. The facts in the present case establish that the Respondent advanced money to Clara Beighley, Naomi Clark and Andrew Masters in various amounts, which according to Respondent's own testimony totaled $2,936.00. It further appears that the practice of Respondent in making such advances was known. One of the witnesses, Elijah Doster, testified that when he contacted Naomi Clark about employing Respondent, Doster told her that the Respondent would lend her money if she needed any. Naomi Clark confirmed this testimony. Andrew Masters testified that the subject of advancing money was discussed with Respondent on the first occasion that Masters visited him."

■ The Supreme Court of Ohio, in agreement with Opinion No. 288 of the Professional Ethics Committee of the American Bar Association, 41 A.B.A. Journal 33 (Jan. 1955) [3] expressed its view that,

"It is obvious that where the advancement of living expenses is made, as in the instant case, to enable a client and his family to survive, any agreement by the disabled client to repay them would not have the effect of providing the attorney with any reasonable source of repayment other than the proceeds received on trial or settlement of his client's claim. In effect, the attorney has purchased an interest in the subject matter of the litigation that he is conducting. The canons contemplate that this will be proper only

where the advance is for 'expenses of litigation'."

In the case of Dombey et al. v. Detroit, Toledo & Ironton Railroad, 351 F.2d 121 (C.A. 6, 1965) we recognized the Ruffalo opinion as apparently announcing the law of Ohio, albeit that it appeared to overrule earlier Ohio decisions. While we are not here required to follow Ohio law, we have thus been made aware of the thinking of its Bar and Supreme Court. The bar of Ohio, acting under its laws and the control of the Supreme Court of that state has a responsibility to maintain the prestige and integrity that should, without exceptions to expediency, be marks of a profession of which we also are members. We may, therefore, give respect to the product of its effort to arrive at and express conceptions as to what is and what is not unprofessional conduct by any Ohio lawyer whom we have admitted to practice before us.

■ We need not, and do not, announce a rule for this Circuit that, standing alone, the conduct involved in Charge No. 8 (the furnishing of living expenses to his clients) would prompt us to discipline Ruffalo. We do not reach that question. We are satisfied that with Ruffalo's previous conviction in 1957 of solicitation, and the conduct making up Charge 13, there is sufficient to permit us, consistent with "principles of right and justice," to "allow the natural consequences of the judgment [of the Supreme Court of Ohio] to have their effect * * *," Selling v. Radford, 243 U.S. 46, 51, 37 S.Ct. 377, 379, 61 L.Ed. 585, and strike Mr. Ruffalo's name from the roll of counsel admitted to practice in this Court.

The admitted facts of Charge No. 13 are that Ruffalo, apparently a specialist in FELA cases, hired Michael Orlando, an employee of the Baltimore & Ohio Railroad, to act under cover as his agent in investigating cases against various railroads. This under cover work includ-

---

3. The late Shackelford Miller, Jr., then, and until his death, a judge of this Court, was a member of, and concurred in the opinion of, the Professional Ethics Committee of the ABA (Opinion No. 288).

ed investigating and obtaining evidence to be used in Ruffalo's cases against Orlando's own employer, the B & O. The employment extended from 1953 to July 19, 1962, when Orlando was suspended by his railroad employer for allegedly soliciting claims (presumably on behalf of Ruffalo). Ruffalo paid Orlando $25 per day, plus expenses for this work, which was carried on outside of Orlando's regular working hours as a railroad brakeman. Through the years 1957 to 1961 this amounted to a total of $13,982.62, of which $4,176 was paid within the first six and one-half months of 1961. This information had to be obtained from the Internal Revenue Form 1099 withholding slips. No other records were available as Orlando was paid in cash, giving receipts to Ruffalo therefor. Regular entries of these transactions were not made in Ruffalo's books and in response to the panel's subpoena to produce his relevant records, Ruffalo testified that whatever writings had been made were destroyed by him as soon as his income tax returns for 1962 and prior years had been examined by the Internal Revenue Service. The Ohio Court's opinion covers this subject in detail and we recite this much of it:

> "The respondent was ordered by a subpoena issued by the board * * * to produce 'all your records, checks, disbursements and receipts of any kind or nature showing payments to Michael Orlando * * * for the years 1957, 1958, 1959, 1960, 1961 and 1962.' Respondent only produced the withholding slips * * *. Respondent was also requested by the chairman of the panel to produce all of his records so that counsel for the relator could determine for themselves whether or not his records contained any entries which would reflect on the payments made by respondent to Orlando * * *. The respondent did not produce his records and refused to comply with the request of the chairman of the panel * * *."

The Court's opinion quotes from Ruffalo's justification for the minimal record keeping and the destruction of whatever records had been made as follows:

> " 'We worked on that basis for the particular reason that we didn't want this man to be accused of exactly what he was accused of, which he wasn't doing and which he did not do, but the fact was that I was trying to protect him. He was trying to help me as an investigator. He had certain knowledge, certain abilities that I needed, and I was trying to protect him, and that was the reason that we worked this thing out this way. With any other person that has ever done any work for me * * * I have paid him by check, but particularly for security reasons for this man, that was the reason we worked it this way.' " 176 Ohio St. 266, 199 N.E.2d 399.

The Ohio Court's reaction to the foregoing is portrayed by this excerpt:

> "The evasive attempts of both Ruffalo and Orlando to explain their lack of records on the basis that they were no longer needed to sustain their income tax returns arouses a strong suspicion that those records contained information which would have been damaging to both Ruffalo and Orlando. Their 1961 income tax returns could not have been filed before January 1962 and were not due until April 1962. In July, 1962, B. & O. charged Orlando with soliciting cases against it for Ruffalo. In September 1962, Ruffalo was charged with employing Orlando to solicit cases for him. Ruffalo undoubtedly knew that such charges were being prepared and investigated long before that time. It is difficult to believe that the 1961 federal income tax returns of either Orlando or Ruffalo had been checked by the Internal Revenue Service before July or even September 1962. At that time, they definitely knew that any records showing either of them to be innocent of charges of soliciting would be helpful to both. It is almost impossible to reach any reasonable conclusion that the records of either, at least for 1961, were not destroyed in order to prevent

their use against Orlando in the proceedings brought against him by B. & O. and against Ruffalo in the proceedings brought against him." 176 Ohio St. 268, 269, 199 N.E.2d 400.

Its view that Ruffalo's conduct disqualified him for practice at Ohio's bar is thus expressed:

"The panel questioned the respondent at length * * * on his views relating to the practice of employing Orlando to investigate cases against the Baltimore & Ohio, while he was employed by the company. He saw nothing wrong with the practice because he was 'doing something altogether different from the type of work he was doing on the railroad' * * *. But he admitted employing Orlando because of the advantages of having a railroad man working for him * * *. He saw no distinction between employing any railroad employee and one who was investigating claims against his own employer, because 'our concepts have changed * * *'." 176 Ohio St. 266, 267, 199 N.E.2d 400.

* * * * * *

"In our opinion, one who believes that it is proper to employ and pay another to work against the interests of his regular employer is not qualified to be a member of the Ohio Bar. He is even less qualified if he does so, when he knows, as the evidence clearly indicates Ruffalo did know, that it is improper to do so." 176 Ohio St. 269, 199 N.E.2d 401.

The rules which should guide us here come from Theard v. United States, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957), and Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917). In *Theard*, the Supreme Court remanded a disbarment case to the District Court which had disbarred an attorney on the assumption that a decision of the Supreme Court of Louisiana foreclosed independent inquiry by the United States District Court.

The disbarment of Theard took place some eighteen years after the charged misconduct—the forgery of a promissory note—notwithstanding the fact that it was found that at the time of the forgery Theard "was suffering under an exceedingly abnormal mental condition, some degree of insanity," and notwithstanding that after release from an insane asylum and restoration to capacity he had for six years practiced law, arguing numerous cases before the Supreme Court of Louisiana without any charge of misconduct or impropriety.

This factual dissimilarity with the case before us is not of controlling significance, but does make quite understandable the Supreme Court's insistence on a Federal Court weighing the validity of the state court's conclusions. Mr. Justice Frankfurter, writing the *Theard* opinion did observe, however, that:

"If the accusation rests on disbarment by a state court, such determination of course *brings title deeds of high respect.*" (Emphasis supplied.)

and emphasized that recognition should be accorded a state court judgment subject, however, to the rule expounded in Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585. In that case the Supreme Court allowed an attorney who had been disbarred by the Michigan Supreme Court to show cause why he should not be disbarred in the United States Courts by bringing the record of the state court proceedings before it and filing a brief. That opportunity has been afforded Ruffalo here, and we have followed the rule of Selling v. Radford, which we quote:

"[W]e should recognize the condition created by the judgment of the state court unless, from an intrinsic consideration of the state record, one or all of the following conditions should appear: 1, That the state procedure, from want of notice or opportunity to be heard, was wanting in due process; 2, *that there was such an infirmity of proof as to facts found to have established the want of fair private and professional character as to give rise to a clear conviction on our part that we could not, consistently with our duty, accept as final the conclusion on that*

*subject;* or 3, that some other grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction that, under the principles of right and justice, we were constrained so to do." 243 U.S. 46, 50, 51, 37 S.Ct. 377, 379, 61 L.Ed. 585, 586, 587, 588. (Emphasis supplied.)

Obedient to that rule, we have formed our own judgment, not, however, unconscious of the fact that six judges of the Ohio Supreme Court and seventeen lawyers of the Bar of Ohio, of such standing as to be selected to serve on the Board of Commissioners on Grievances and Discipline, have, after fair procedure, concluded that Mr. Ruffalo's conduct called for his suspension from practice. We do not find in the record of the state proceedings, "Such an infirmity of proof as to the facts found to have established the want of  *  *  *  [Ruffalo's] fair private and professional character" to lead us to a conviction that we cannot, consistent with our duty, "accept as final the conclusion" of the Supreme Court and the Ohio bar.

Able and distinguished counsel have urged us, on the merits, to disagree with Ohio's assessment of the facts now before us. We consider this matter as judges, but we are aware that we are also members of the bar, sharing with our fellow lawyers a just pride in our profession and we are properly concerned that the legal profession be worthy of the respect that it asks today's society to accord it. We have a responsibility not only to Mr. Ruffalo but also to the prestige of our own court. We cannot find totally invalid the view that an experienced lawyer who hires a railroad employee to act as an undercover agent to obtain evidence and information for use in suits against his own employer, does not exhibit the fair character and integrity which must be a mark of a lawyer. Ruffalo asserts that his use of cash to pay his agent, his failure to car-

ry these transactions in his books, and his destruction of what records he did have were necessary to protect Orlando from reprisals by his regular employer. The Ohio Bar, its Supreme Court and this Court had, and have, the right to draw inferences as to what this conduct portrays. The absence of records would not hide what was going on if, when inquiry was made, both Orlando and Ruffalo told the truth. What then was there to fear from honest record keeping?

Respondent argues that the Association of American Railroads was guilty of questionable practice in investigating the misconduct of Orlando and Ruffalo and that the American railroads historically have unfairly resisted and impeded the presentation of claims by their injured employees. Unless we are ready to announce a rule that a lawyer may fight on any level chosen by his adversary, we are not here required to pass on such charges. With the liberal use of our discovery practice, we consider that adequate preparation can be made without resorting to the methods chosen by Mr. Ruffalo. We do not believe we should tell today's society that notwithstanding the respect we ask it to give us as a profession of skillful and high minded men, we do not have the ability to adequately represent our clients except through planting secret agents in the shops of those we call to account in the courts. If this kind of espionage has become a way of life in some of today's business competition, such reality should not prompt us to say that no more is expected of today's lawyers than that they conform to the minimal standards of the market place.

Charge No. 13, the employment of Orlando, was added as a specification of misconduct during the course of the Board of Commissioners' hearing. Mr. Ruffalo objected to this being done, and the Board advised him that he could have time to offer proofs in opposition to the charge. The charge was based upon testimony of Ruffalo and Orlando already in the record. No request was made for further time, and no additional

proofs were offered by Ruffalo on the point. We find no procedural impropriety in this regard. Neither do his counsel raise the question here. They do, however, assert deprivation of due process in that prior to Ruffalo's described use of Orlando, he was never told that such would be looked upon as misconduct. They complain for him that no Canon of Ethics had ever been promulgated forbidding this practice. We will not hold that due process requires that our bar associations anticipate every conceivable type of misconduct in which any of its members may indulge, and then fashion and announce a Canon of Ethics to fit each act of misconduct. Surely our profession is not so morally and ethically naive as to need always advance definition of what is, and what is not, impermissible behavior.

This is an original proceeding in this Court. We are not reviewing the ruling by the District Court. Respectful of the careful consideration of the matter by the District Judge, we advise our disagreement with his conclusions. While not controlling, we think it proper to observe that it would be most unseemly, considering the record in the case, to have the United States Courts accepting for practice before them a lawyer who has, after due process, been suspended from practice in the courts of his own state.

The name of John Ruffalo, Jr., is hereby stricken from the roll of counsel permitted to practice before this Court. This discipline shall remain in force until the further order of this Court.

### APPENDIX

### FINDINGS OF FACT OF THE BOARD OF COMMISSIONERS ON GRIEVANCES AND DISCIPLINE.

#### Charge No. 3

It is charged that the Respondent, acting through an authorized agent, solicited the claim of Mrs. Naomi Mae Clark against the Baltimore and Ohio Railroad Company by reason of the death of her husband, Major Robert Clark who died August 13, 1957 in an accident while employed as an engine house laborer for the Baltimore & Ohio Railroad.

Naomi Clark testified that her husband had worked for the Baltimore & Ohio Railroad in Newcastle and that he died on August 13, 1957 and that two weeks after her husband's death, Elijah Doster came to see her and told her that the Respondent wanted her case. She further testified that she knew of the Respondent and that a Mr. Orlando and others had talked to her about a week after her husband's death and one of those who had seen her gave her the Respondent's telephone number. She said that Elijah Doster told her that the Respondent was the man to employ and that he was also handling Elijah Doster's claim against the railroad.

It appears that Mrs. Clark had known Elijah Doster for a period of approximately twenty-one years. She testified that arrangements were made through Mrs. Betty Orlando, the sister of Michael Orlando, to meet Respondent in Newcastle and that she did meet him there. Betty Orlando is the sister-in-law of Michael Orlando who was an employee of Respondent and also the Baltimore & Ohio Railroad. On September 3, 1957 Mrs. Clark signed a contract employing Respondent to represent her. The contract (Respondent's Exhibit 4) is a printed form which recites in the printed portion that

"I, the undersigned, do hereby retain John Ruffalo as my attorney, acting only upon my own free will without the inducement or solicitation of any person or persons * * *."

Mrs. Clark testified that she had been told by Elijah Doster that the Respondent would let her have money if she needed any during the time he would have her case, and that when she saw the Respondent in September, 1957 he told her that if she needed money he would give it to her. Mrs. Clark's case was settled on November 18, 1960, for $21,000.00, and the Respondent advanced approximately $600.00 to her from time to time before the settlement.

Elijah Doster testified that he had employed Respondent to represent him in a claim against the Baltimore & Ohio Railroad and that while his case was pending, Respondent called him and asked him to talk to Naomi Clark about her case against the railroad, and that pursuant to this request he did talk to Mrs. Clark about employing the Respondent. Doster testified that Angelo Medura phoned him the day before the hearing by the Panel and requested him not to come to court. It also appears that more than a year after Doster's case was settled, the Respondent contacted Doster and gave him $50.00 as a refund for medical fee which related to Doster's case against the railroad. Doster executed a receipt for the fee, dated July 14, 1961 (Respondent's Exhibit 1) and a year later on June 20, 1962 signed a statement for the Respondent (Respondent's Exhibit 2) to the effect that the $50.00 paid to Doster by Ruffalo "was given to me solely as a refund of the medical bill incurred by an examination of Dr. Robinsteen. Dr. Robinsteen died and was unable to appear for me, requiring me to obtain other doctors. * * *." This statement was witnessed by Doster's son, Samuel Doster.

On July 14, 1961, the same day on which Doster was requested to sign a receipt for the $50.00, he also signed an affidavit at the Respondent's office, which affidavit was prepared by the Respondent (Respondent's Exhibit 6). This affidavit recites that

> "Elijah Doster, after first being duly sworn, according to law, deposes and says that at the request of Mr. Ruffalo, he recommended John Ruffalo of Youngstown, Ohio, to Naomi Clark, that he contacted Gordy Marks of Newcastle, Pennsylvania, the brother-in-law of Naomi Clark, who spoke to her about Mr. Ruffalo, and that he learned a few days after that that Naomi Clark had gone to see Mr. Ruffalo, that after his original contact with Mr. Marks, he had talked with Naomi Clark and she informed him that she had gone out to see Mr. Ruffalo,

* * * and that it was upon the recommendation that he had made that she came to see Mr. Ruffalo."

When Respondent was testifying on his own behalf he admitted he asked Elijah Doster to recommend Respondent to Naomi Clark, but says this was done "about 15 or 20 minutes before I had any—before I represented her."

Sam Doster testified that he heard his father state to Mr. Ruffalo that he saw Mrs. Clark at Mr. Ruffalo's request.

It also appears that contact was made by Respondent and Angelo Medura of Newcastle, Pennsylvania, with Sam Doster, relating to the question of Elijah Doster's appearance to testify before the Panel, and that Sam Doster was given $5.00 by Medura and a bottle of Respondent's whiskey. This took place at a meeting between Youngstown and Newcastle on December 24, 1962.

At the original hearing held by this Panel in December, 1962, Sam Doster testified about a discussion between himself and Medura, at this meeting, concerning a charge of homicide then pending against Sam Doster in Pennsylvania. According to Sam Doster, Medura told him that he knew it would cost quite a fee "And he said 'You know that John can't do it himself,' that 'Whatever you need,' that 'I'll get in touch with John for you, and he would give it to me to give you.'" He further testified that this conversation took place outside of the Respondent's car while Respondent was sitting in the car. However, at a subsequent hearing held by the Panel on August 16, 1963, the same Sam Doster was called to testify on behalf of the Respondent. At this hearing he testified that he lied at the previous hearing; that Medura had offered him nothing to persuade his father, Elijah Doster, not to appear at the hearing before the Panel.

Doster said he'd decided to tell the truth because he realized his testimony at the previous hearing had damaged Respondent and he didn't feel right about it. He said he'd lied because he thought

the Respondent had not represented his father properly and had been so informed by some representatives of the American Railroad Association. He could not explain why he decided since the December hearing, to change his story. Since the December hearing, he was tried on the homicide charge in Pennsylvania and found guilty. He was out on bond at the time of the August hearing. Whether this had anything to do with the change in this witness' story was not shown. Because of this recantation by Sam Doster of his testimony at the preceding hearing, the Board has placed no credence whatever in this witness' testimony, given either at the preceding hearing or at the present hearing.

At the hearing in December, 1962 the Respondent offered a tape recording of a conversation between the Respondent and his associate, Mr. Montani, with Elijah Doster. Although the recording was played at one of the hearings held by the Panel, it was inaudible. At the last hearing held on August 16, 1963, the Respondent produced David Burton, a free lance court reporter, who testified that there had been submitted to him a transcript of the tape recording, which had been prepared by the Respondent's secretary, and that the witness compared this transcript with the recording and corrected the transcript in several respects. The witness' transcript was then offered in evidence as an exhibit. However, the Panel sustained the objection to this exhibit and the Board has given it no consideration for the reason that a witness' testimony concerning his interpretation of a tape recording of a conversation with another witness violates the hearsay rule and the rule excluding the opinions of witnesses except in certain defined exceptions of which this is not one.

The Respondent testified that he was first contacted about the Naomi Clark case, by Mrs. Alexander Orlando, Mike Orlando's sister-in-law, on September 30, 1957, when he had returned from a vacation, and that Mrs. Orlando said that she was a friend of Naomi Clark and that

Naomi Clark wanted to see him and he suggested that Miss Clark come to see him, but Mrs. Orlando told him she couldn't come and suggested that the Respondent come to Mrs. Orlando's home. Respondent said that he had never known Mrs. Orlando before, although she was the sister-in-law of Mike Orlando who was then an employee of the Respondent.

Mrs. Lois Scopio, Michael Orlando's sister, testified that she was a bookkeeper at a store in Newcastle where Naomi Clark had purchased a coat, and that Naomi Clark had no money to pay for the balance due on the coat, and in the course of the conversation about her account she asked the witness whether she had ever heard of the Respondent, and then asked the witness to call the Respondent, which Mrs. Scopio said she did, but was unable to reach him because he was on a vacation. She testified that Naomi Clark subsequently told her that she had talked to Betty Orlando, Michael's sister-in-law, and had asked her to get in touch with the Respondent.

## CONCLUSION

It is the conclusion of the Board that the evidence with respect to this charge establishes that Respondent was guilty of misconduct in soliciting employment from Mrs. Naomi Clark in violation of Canon 27 of the Canons of Professional Ethics.

### Charge No. 8

It is charged that the Respondent advanced monies to Clara E. Beighley, Naomi Clark, and Sam Cotellesse while handling their claims, and deducted such advances from settlements of their claims. The uncontradicted evidence establishes that Respondent did advance a total of $1,025.00 to Clara Beighley during the period of time that he represented her, and that he advanced $611.00 to Naomi Clark during the time that he represented her. Respondent's representation of each of these parties extended over a period of several years. Respondent admits that these funds were advanced, but justifies the advances on the

ground that they were made as an act of kindness at a time when these clients were in difficult circumstances. No evidence was offered to prove any advances to Sam Cotellesse.

The Legal Ethics Committee of the American Bar Association rendered an opinion, Number 288, on October 11, 1954, to the effect that payments, pending trial in personal injury cases, by an attorney to or for the benefit of his injured client, for any purpose other than to cover expenses of litigation subject to reimbursement, are improper. In reaching this conclusion the committee considered Canon 42 which provides:

"A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation. He may in good faith advance expenses as a matter of convenience, but subject to reimbursement."

The Committee also considered Canon 10 which provides:

"The lawyer should not purchase any interest in the subject-matter of the litigation which he is conducting."

Canon 42 refers to expenses which are connected with the litigation such as court costs, depositions and similar expenses. It was the committee's opinion that a lawyer who makes advances to his client for other purposes thereby acquires an interest in the subject matter of the litigation which he is conducting in violation of Canon 10. The committee also observed that the practice, if publicized, constitutes a holding out by the lawyer of an improper inducement to clients to employ him in addition to the assurance of performing legal services for the client. In other words, such practice can constitute an indirect form of solicitation. The committee observed that the conclusion which it reached is contrary to the conclusion reached by the Supreme Court of Illinois in the case of People ex rel. Chicago Bar Association v. McCallum, 341 Ill. 578, 173 N.E. 827. Three of the judges of the Supreme Court of Illinois dissented from the conclusion of the majority. The question was considered by Judge Beamer of the United States District Court for the Northern District of Indiana, Hammond Division, on September 26, 1962, in the case of El Janny v. Cleveland Tankers, Inc., 209 F.Supp. 91. Judge Beamer held that a lawyer was not entitled to an order reimbursing him for monies advanced to his client and stated in the opinion:

"The propriety of the practice of loaning or advancing money to clients in personal injury cases has long been questioned by the Courts and the organized bar."

He cited and quoted from Opinion 288 of the Committee of the American Bar Association.

While it may be questioned whether or not an occasional advance or loan by a lawyer to a client constitutes a violation of Canon 10 or Canon 27, it is clear that where such advances are frequently made to various clients over an extended period of time, such practice does establish the violation of Canon 10 in that the lawyer acquires an interest in the subject matter of the litigation which he is conducting, beyond the payment of his fee. Moreover the practice constitutes an indirect form of solicitation in providing an inducement to seek out such lawyers for employment for reasons unrelated to their professional competence. The facts in the present case establish that the Respondent advanced money to Clara Beighley, Naomi Clark and Andrew Masters in various amounts, which according to Respondent's own testimony totaled $2,936.00. It further appears that the practice of Respondent in making such advances was known. One of the witnesses, Elijah Doster, testified that when he contacted Naomi Clark about employing Respondent, Doster told her that the Respondent would lend her money if she needed any. Naomi Clark confirmed this testimony. Andrew Masters testified that the subject of advancing money was discussed with Respondent on the first occasion that Masters visited him.

## CONCLUSION

It is, therefore, the conclusion of the Board that the Respondent is guilty of unprofessional conduct in violation of Canon 10 and Canon 27.

## Charge No. 9

It is charged that Respondent promised to advance money and later did advance money to Andrew Masters during the pendency of Masters' case against the Pennsylvania Railroad. The evidence establishes that there was a discussion between the Respondent and Masters about the advancement of money to Masters at the time Masters first saw Respondent and signed his contract of employment on May 29, 1958 (Respondent's Exhibit 10), and that Respondent advanced monies to Masters on fifteen separate occasions in a total of over $1,200.00 during the period Respondent was representing Masters.

## CONCLUSION

It is the conclusion of the Board that Respondent is guilty of unprofessional conduct in violation of Canon 10 and Canon 27 of the Canons of Ethics.

## Charge No. 10

It is charged that Respondent is guilty of unprofessional conduct in attempting to influence Elijah Doster in that he endeavored to have Doster sign a false statement that Doster had not been contacted by the Respondent in an effort to have Doster help in the solicitation of the case of Naomi Clark; that at the time Respondent attempted to take said false statement from Doster he paid him the sum of $50.00 in cash. Some of the evidence in support of this charge is discussed in connection with Charge No. 3 pertaining to solicitation by Doster on behalf of the Respondent of Naomi Clark's case. The evidence does establish that on or about July 14, 1961, Respondent prepared an affidavit which Elijah Doster refused to sign until it was corrected, but there is no evidence as to the contents of such affidavit and, therefore, it cannot be said that the Respondent attempted to have Doster sign a false affidavit. However, the evidence does establish that on the same date Respondent paid $50.00 to Doster and requested him to sign the affidavit, an investigation was being made by a Mr. White of the American Association of Railroads relating to Respondent's activities in suspected solicitation of claims. The payment by Respondent to Doster on that date was obviously for the purpose of influencing Doster as a prospective witness.

## CONCLUSION

It is the conclusion of the Board that the Respondent was guilty of misconduct in attempting to influence Elijah Doster by the payment of $50.00 to him, in violation of Canon 29 and Canon 32 of the Canons of Professional Ethics.

## Charge No. 11

It is charged that on Christmas Eve, December 24, 1962, the Respondent attempted to intimidate Samuel Doster who was to appear before the hearing panel, by approaching him at Lincoln Knolls Bowling Alley on Route 422 in Youngstown, to prevent him from appearing as a witness by offering him sundry considerations; that the Respondent gave Sam Doster a fifth of whiskey and $5.00 for the purpose of prevailing upon him to prevent his father, Elijah, from appearing as a witness.

The evidence with respect to this charge was reviewed above in connection with the consideration of Charge No. 3 relating to Naomi Clark's claim. The evidence is uncontradicted that the Respondent and Angelo Medura did have a meeting with Samuel Doster on Christmas Eve, December 24, 1962, which was after the Respondent received notice of the hearing scheduled by the Panel for December 26, 1962. Respondent said that he merely talked to Sam Doster and asked him to request Sam Doster's father, Elijah, to tell the truth. He denies attempting to influence Sam Doster. It is nevertheless a fact, as testified to by Angelo Medura, that the Respondent did contact Medura for the purpose of having Medura talk to Andrew Masters and

that Medura did contact Andrew Masters in connection with the charges pending against Respondent, and that the Respondent was also with Medura for the purpose of talking to Sam Doster. At this meeting Medura did in fact give Sam Doster $5.00 and a bottle of whiskey which was the property of Respondent. While the evidence does not definitely establish that the Respondent was a party to the discussion between Medura and Sam Doster, it is a fact that such discussion took place outside of Respondent's automobile and that Respondent was in the automobile at the time it took place. It is reasonable to infer that whatever discussion took place between Medura and Doster was known to Respondent. Inasmuch as the admitted purpose in seeing Sam Doster was to have him contact his father, Elijah, about his testimony at the hearing before the Panel, it must be concluded that the gifts made to him at this meeting, were for the purpose of influencing him and thereby accomplishing the objective of the meeting. In reaching the conclusion with respect to this charge, the Panel completely disregarded the testimony of Sam Doster given at the original hearing of the Panel in December, 1962, as stated previously in the discussion on Charge No. 3, because this witness recanted that testimony at the hearing held on August 16, 1963 and said that he lied at the December hearing. For the same reason, the Panel disregarded Doster's testimony given at the hearing held on August 16, 1963.

## CONCLUSION

It is the conclusion of the Board that the Respondent is guilty of misconduct as charged and has violated Canon 29 and Canon 32 of the Canons of Professional Ethics.

## Charge No. 12

It is charged that the Respondent, through one or more of his agents acting on his behalf, did attempt to intimidate the witness, Andrew Masters, on or about Sunday, December 23, 1962, by having his agent offer Masters the sum of $300.00 to keep him from appearing before the Panel as a witness on behalf of the Relator.

Some of the evidence with respect to this charge is discussed above in connection with Charge No. 11. It does appear from the testimony of Andrew Masters that Angelo Medura called Masters on December 23, 1962, and met him and told Masters that "He had an opportunity to get some beer joint, that Mr. Ruffalo was going to back him up * *. * "; that Medura further said "You can get $300.00 and you don't have to appear and you're doing me a hell of a big favor." Medura admits talking to Masters on Sunday, December 23, 1962, at Newcastle about Masters' appearance as a witness before the Panel, and that he saw Masters at the Respondent's request. He denied offering Masters any money and explained that Masters was angry with Respondent because Masters was not satisfied with the verdict which had been obtained and because the Respondent did not appeal the case. Medura does admit stating to Masters "Andy, what are going to gain by going over to Youngstown to hurt this man."

In view of the fact that Medura had contacted Masters at Respondent's request and had also talked to Sam Doster in the presence of Respondent about being a witness before the Panel in the charges against the Respondent, and had admittedly offered Doster inducements not to appear as a witness, the Board concludes that the evidence supports the charge that Medura did offer Masters a consideration to prevent Masters from appearing as a witness against the Respondent.

At the hearing which the Panel held on August 16, 1963, the Respondent called two witnesses, Joseph Edward Petite and Carl R. Foster, who testified that on December 27, 1962, they had gone to the dining room of the Tod Hotel in Youngstown at the request of the Respondent, and taken a table next to that which was occupied by Mr. and Mrs. Masters and a Mr. White, who represented the American Association of Railroads, and that during

this conversation Masters was overheard telling White that Medura did not offer Masters any money, and that Masters was a friend of Medura's and did not want to hurt him, and White replied that while Masters did not want to hurt Medura he did want to get at Ruffalo, and White told Masters that Masters should go in and testify about being offered $300.00 by Medura. Both of these witnesses admitted that the Respondent had formerly represented them in personal injury cases. They were both employed at the time they gave their testimony. They said they occasionally did work for the Respondent. The Relator objected to the testimony of both of these witnesses concerning the conversations which they allegedly overheard between White and Masters. The objection was sustained for the reason that if the purpose of such testimony was to contradict the testimony given by Masters at the previous hearing, it was necessary to lay a foundation for such contradictory testimony by first asking Masters himself about the alleged conversation between him and White. This was not done, and therefore, the testimony of both of these witnesses was nothing more than hearsay. King v. Wicks, 20 Ohio 87, 88; City of Columbus v. Freeze, 100 Ohio App. 37, 135 N.E.2d 419, 59 O.O. 474; 56 O.Jur.(2d) 816, Sec. 380.

## CONCLUSION

It is the conclusion of the Board that the Respondent is guilty of unprofessional conduct as charged and has violated Canon 29 and Canon 32 of the Canons of Professional Ethics.

EDWARDS, Circuit Judge (dissenting).

Respectfully, I dissent from the opinion of the court.

This is a disturbing record on practically all counts. The State of Ohio, acting through its Bar Association and Supreme Court, has disbarred respondent on grounds which will be discussed. The Ohio disbarment is final and is not before us for review.

Dealing with a motion to disbar respondent before the United States District Court for the Northern District of Ohio, the United States District Judge reviewed the same record and held that adequate grounds for disbarring respondent from practice before the federal courts had not been established. In re Ruffalo, 249 F.Supp. 432 (N.D.Ohio 1965).

We deal, under our Court Rule 6(3),[1] with a similar petition to disbar respondent in this court. We review the same record.

The respondent was a lawyer in active practice principally representing railroad employees in Federal Employers' Liability Act suits against railroad companies. The Association of American Railroads instigated an investigation of respondent which led directly to the present charges and proceedings.

Most of the testimony adverse to respondent was that of former clients in relation to whose cases respondent had not succeeded in achieving a result satisfactory to them—or for that matter, to him.

The basic charges at the outset were that respondent had engaged in unethical conduct as a lawyer by soliciting lawsuits and employing others to solicit lawsuits for him—in short, what is termed "ambulance chasing."

The State Bar Association panel dismissed seven of fourteen charges and found respondent guilty on the other seven. In its review of the same record the Supreme Court of Ohio, however, found respondent guilty of unethical practices in only two instances. These concerned the making of certain loans to two of respondent's clients and the hiring as an investigator of a person who was also a brakeman for the Baltimore & Ohio Railroad.

1. Rules of United States Court of Appeals for Sixth Circuit (May 1, 1956, as amended April 15, 1966).

In finding the loans made by respondent to be violations of the Canons of Professional Ethics of the American Bar Association (which have been adopted by rule in Ohio), the Ohio Supreme Court relied upon Canon 10, which says: "The lawyer should not purchase any interest in the subject-matter of the litigation which he is conducting."

The undisputed facts are that out of a very busy practice and after a thorough and thoroughly hostile investigation respondent was shown to have made such loans in two instances.

On June 16, 1957, Mrs. Clara Beighley's husband died as a result of an injury received while working as a conductor for the Baltimore & Ohio Railroad. His widow employed Ruffalo to represent her in her claim against the B. & O. In the next four years respondent advanced periodic sums of $50 to Mrs. Beighley, which ultimately totaled $1,025.

The other loan pertained to another B. & O. widow. Mrs. Naomi Mae Clark's husband died August 13, 1957, in an accident while employed as an engine house laborer. Mrs. Clark retained respondent on September 3, 1957, and approximately three years later received $21,000 in a settlement with the B. & O. Meantime, respondent had made periodic advances to her which totaled $611 at the time of settlement.

I cannot in good conscience agree that the making of such small loans as these to two admittedly impoverished widows represented purchasing an interest in litigation. If this record showed that making maintenance loans to clients was a general practice employed by respondent so as to become widely known and hence to constitute an economic attraction for potential clients, we would have facts from which such an inference properly could be drawn. Clearly we do not have such proofs in this record.

We recognize, of course, that the American Bar Association's Professional Ethics Committee has published an opinion, No. 288, (41 A.B.A. Journal 33 (Jan. 1955)) which may be cited as general support for the view expressed by the Ohio Supreme Court. This view is, however, against the great weight of opinion in the courts in this country. People ex rel. Chicago Bar Association v. McCallum, 341 Ill. 578, 173 N.E. 827 (1930); Johnson v. Great Northern Ry. Co., 128 Minn. 365, 151 N.W. 125, L.R.A.1917B, 1140 (1915); Hildebrand v. State Bar of California, 18 Cal.2d 816, 117 P.2d 860 (1941); In re Moore, 8 Ill.2d 373, 134 N.E.2d 324 (1956); In re Sizer, 306 Mo. 356, 267 S.W. 922 (1924); Bank of Chenango v. Hyde, 4 Cow. 567 (N.Y. 1825); see also Grievance Committee of Fairfield County Bar v. Nevas, 139 Conn. 660, 96 A.2d 802 (1963); State ex rel. Florida Bar Association v. Dawson, 111 So.2d 427 (Fla.1959). We likewise feel that it is a view which is basically inconsistent with the attitude toward legal representation in FELA cases expressed by the Supreme Court of the United States in Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964).

The view of the Illinois Supreme Court adopted in *McCallum* in my opinion expresses the majority view in this country on this issue:

"The evidence shows that at various times the McCallums have advanced living expenses to needy clients who had claims for personal injuries against railroad companies where respondent had a fee contract, which was a lien upon any damages which might be recovered upon the injury. In most such cases the clients were unable to work, had no money or property, and their only asset was the claim for damages against the railroad, upon which respondent had a lien. We know of no law which makes it more unethical, under such circumstances, to advance living and medical expenses to the client, and so prevent his becoming a public charge, than it would be, if the client's only asset were a piece of real estate, to advance him, on a mortgage thereon, money for such expense. It is not uncommon for at-

torneys to commence actions for poor people and make advances of money necessary for the prosecution of the suit upon the credit of the cause. Thus a man in indigent circumstances is enabled to obtain justice in a cause where without such aid he would be unable to enforce a just claim. Christie v. Sawyer, 44 N.H. 298; Shapley v. Bellows, 4 N.H. 347, 355. The practice of advancing money to the injured client with which to pay living expenses or hospital bills during the pendency of the case and while he is unable to earn anything may in a sense tend to foment litigation by preventing an unjust settlement from necessity, but we are aware of no authority holding that it is against public policy or of any sound reason why it should be so considered. Johnson v. Great Northern Railway Co., 128 Minn. 365, 151 N.W. 125, L.R.A. 1917B, 1140; Potter v. Ajax Mining Co., 22 Utah 273, 61 P. 999. By canon 42 of the Ethics of the American Bar Association, it is permissible for an attorney to advance costs and court charges for his client, with the understanding that the same are to be ultimately paid by the client." People ex rel. Chicago Bar Association v. McCallum, supra, 341 Ill. at 589, 173 N.E. at 831.

I turn now to the second issue in this case. Respondent employed one Orlando, whose regular occupation was that of a brakeman on the B. & O. Railroad. He worked on a night shift. Respondent testified that Orlando's employment with him was that of an investigator of FELA cases brought by respondents against railroads, including Orlando's employer.

I note that Orlando's work involved no supervisory responsibilities to his employer and no access to records, confidential or otherwise, which would have assisted him in his daytime job with respondent.

But discounting these factors as much as I do, I cannot avoid concluding that Orlando's access to the B. &. O.'s prop-erty and personnel would be of potential value to respondent and that it would some times be impossible (probably even for Orlando) to know when Orlando was working for the railroad and when he was investigating for respondent.

I believe the day is long gone when a railroad so owned its employees' souls that it should be held impermissible for one of its brakemen to accept outside employment on his own time (even as an investigator of lawsuits against another railroad). But the employment of a railroad employee to investigate accident claims against his own employer opens a tempting door to industrial spying which no person of ordinary conscience should be asked to go by every normal work day.

Respondent's actions in hiring Orlando for the purposes admitted by respondent, in concealing the employment relationship and in being a great deal less than fully cooperative with the Bar Association's investigation of his record in this matter convince the majority that he was aware of the conflict of interest inevitable (for Orlando!) in his hiring Orlando to investigate accident cases against Orlando's own employer. These facts also convince me.

This, however, does not end the matter. In order for a lawyer properly to be found guilty of an offense and barred, perhaps forever, from the practice of his profession, he should have advance notice that the act he was charged with was an offense, and prior to his hearing he should have written notice of the charge made against him. Respondent here had neither.

The charge we deal with here was numbered 13 and it was added by oral motion at page 662 of this 1034 page transcript over respondent's strong objection. Such procedural violation of due process would never pass muster in any normal civil or criminal litigation. Nor should it here. Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917).

Even more to the point, the Ohio Bar Association and the Ohio State Supreme Court were unable to cite any canon of ethics which purported to forbid respondent's conduct in hiring Orlando. Neither do my colleagues. Nor is any prior ethics opinion or case precedent cited for the holding here.

Under the circumstances, I would think that the course of action taken by the Illinois Supreme Court in In re Brotherhood of Railroad Trainmen, 13 Ill.2d 391, 398, 150 N.E.2d 163, 168 (1958), was an appropriate one to follow. In declaring a representation plan (previously approved by another court) to be improper, the Supreme Court then held that "proceedings looking toward the imposition of discipline should not be pursued. * * *" in that case.

There is an ancient adage, "Where there is smoke there is fire." If this were a governing rule of law, I would quickly have agreed with my brethren's result in this case. This record surely contains a great deal of smoke. The writer confesses that he, too, is capable of being impressed thereby.

Finding myself, however, in fundamental disagreement with relying for disbarment on the issues dealt with above, I undertook research of the record for a possible concurring opinion which I thought would be founded upon the ambulance chasing and witness tampering findings of the Ohio State Bar. To abbreviate a lengthy recital and weighing of a record of over 1,000 pages of transcript, I note that I simply could not find reliable evidence upon which to approve these findings. I deduce that my colleagues cannot do so either. Yet they include as an appendix these same findings upon which neither they nor the Ohio Supreme Court saw fit to rely.

For the reasons I have indicated above, I feel there are "grave reasons" why this court should agree with the United States District Judge in declining to accept the judgment of disbarment of the Supreme Court of Ohio.